In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2623

WISCONSIN RIGHT TO LIFE STATE
POLITICAL ACTION COMMITTEE,

*Plaintiff-Appellant,*

*v.*

THOMAS BARLAND, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 10-C-0669—**Charles N. Clevert, Jr.**, *Chief Judge.*

ARGUED SEPTEMBER 22, 2011—DECIDED DECEMBER 12, 2011

Before POSNER, FLAUM, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* In anticipation of the 2010 general elections, Wisconsin Right to Life and its State Political Action Committee filed a broad-spectrum federal lawsuit challenging various Wisconsin campaign-finance laws under the First Amendment. At issue here is a statute that limits the amount individuals may contribute to state and local candidates, political parties, and political committees to a "total of $10,000 in any calendar year." WIS. STAT. § 11.26(4).

When the lawsuit was filed, the November elections were looming, so the plaintiffs sought a preliminary injunction enjoining enforcement of the laws they had challenged, including section 11.26(4). The defendants—members of the Government Accountability Board ("GAB") and the Milwaukee district attorney—asked the district court to abstain and stay the case pending resolution of *Wisconsin Prosperity Network v. Myse*, No. 2010AP001937 (Wis. filed Aug. 9, 2010), an original action in the state supreme court challenging a newly amended campaign-finance rule that dramatically expanded the scope of political speech subject to Wisconsin's regulatory regime. The new rule, GAB 1.28, is implicated in this suit as well.

The district court agreed that *Pullman* abstention was appropriate and put the entire case on hold. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941). The November 2010 elections came and went. A few months later, a stunning off-year political phenomenon occurred: Nine state senators were forced into recall elections to be held during the summer of 2011. The Right to Life PAC returned to court and asked the judge to lift the stay and enjoin enforcement of section 11.26(4) so that it could raise unlimited funds for independent expenditures during the recalls. The judge denied this request. The Right to Life PAC appealed and sought an injunction pending appeal. A motions panel held that the First Amendment challenge was likely to succeed and issued the injunction.

On full appellate review, we agree with that preliminary assessment and now vacate the abstention order

and remand with instructions to enter a permanent injunction enjoining enforcement of section 11.26(4) on the terms specified in this opinion. First, *Pullman* abstention was unwarranted; the constitutionality of section 11.26(4) does not depend on whether GAB 1.28 survives review in the Wisconsin Supreme Court. On the merits, after *Citizens United v. FEC*, 130 S. Ct. 876 (2010), section 11.26(4) is unconstitutional to the extent that it limits contributions to committees engaged solely in independent spending for political speech. *Citizens United* held that independent expenditures do not pose a threat of actual or apparent quid pro quo corruption, which is the only governmental interest strong enough to justify restrictions on political speech. *Id.* at 909-11. Accordingly, applying the $10,000 aggregate annual cap to contributions made to organizations engaged only in independent spending for political speech violates the First Amendment.

## I. Background

The Right to Life PAC is a Wisconsin political committee engaged in independent expenditures for political speech—specifically, independent spending for speech advocating the election of candidates for Wisconsin state and local public office. It does not make contributions to political candidates, and as an independent political committee, its activities are not coordinated with any candidate or political party.

In 2010 Terry and Mary Kohler wanted to donate $5,000 to the Right to Life PAC, but because of other political

contributions they planned or had already made, their contributions would violate section 11.26(4), which imposes a $10,000 cap on the aggregate annual amount individuals may contribute to state or local candidates, political parties, and political committees. WIS. STAT. § 11.26(4). In August 2010 the Right to Life PAC filed a verified complaint in federal court alleging that section 11.26(4) and various other Wisconsin campaign-finance statutes and regulations violate the First Amendment. As relevant here, the suit contends that section 11.26(4) is unconstitutional to the extent that it limits contributions to committees, like the Right to Life PAC, that only engage in independent spending for political speech.

Because the November 2010 elections were fast approaching, the Right to Life PAC moved for a preliminary injunction enjoining the enforcement of the statutes and regulations it was challenging. The district court did not rule on the motion. Instead, the defendants—members of the GAB, which implements Wisconsin's election laws, and the Milwaukee County District Attorney, who prosecutes violations—asked the court to abstain under *Pullman* and stay the entire action to await the outcome of *Wisconsin Prosperity Network*, a case then pending in the Wisconsin Supreme Court. *Wisconsin Prosperity Network* is an original action challenging GAB 1.28 of the *Wisconsin Administrative Code*, a newly amended campaign-finance rule published by the GAB on July 31, 2010. Among other things, GAB 1.28 substantially expanded the reach of Wisconsin's campaign-finance regulatory apparatus to cover the political

speech of individuals and organizations other than candidates and political committees.

The district court agreed that *Pullman* abstention was appropriate "as a matter of comity." Because the state supreme court was considering the validity and scope of GAB 1.28 in the *Wisconsin Prosperity Network* litigation, the judge thought he should wait for that court's views on "the viability of its state's regulatory regime" before ruling on the federal constitutional questions. *See Pullman*, 312 U.S. at 500; *Int'l Coll. of Surgeons v. City of Chicago*, 153 F.3d 356, 365 (7th Cir. 1998) (explaining that *Pullman* abstention is appropriate when the meaning of state law is uncertain and the state court's clarification might eliminate the need for a federal constitutional ruling). On September 17, 2010, the court granted the defendants' motion and stayed the case in its entirety.

The November 2010 elections dramatically changed the political landscape in Wisconsin. Republicans won the governor's office and both houses of the state legislature, and picked up a U.S. Senate seat and two in Congress.[1] When the new governor and his allies in the state legislature began to make use of their electoral advantage in early 2011, Wisconsin found itself at the center of a political storm. The flashpoint was the governor's budget-repair bill, which included measures

---

[1] *See* Craig Gilbert, *River of Red Buries the Blue*, MILWAUKEE J. SENTINEL, Nov. 3, 2010, http://www.jsonline.com/news/statepolitics/106589258.html.

curbing public-employee collective-bargaining rights.[2] Democrats in the State Senate fled the state to thwart a vote on the bill and remained in hiding in Illinois for weeks.[3] Mass protests were staged on the grounds of the State Capitol, and protesters encamped in the Capitol rotunda.[4] In the meantime the Wisconsin Supreme Court scheduled oral argument in *Wisconsin Prosperity Network* for March 9, 2011, but later postponed the hearing until September 6, 2011.

The controversial budget-repair bill passed on March 10, but that did not end the political turmoil.[5] Sixteen state senators were targeted for recall, and by summer 2011 nine senators—six Republicans and three Democrats—were forced to stand in recall elections scheduled for July and August.[6] In response to this unprecedented

---

[2] *See* Jason Stein, Patrick Marley & Lee Bergquist, *Assembly Passes Union Measure After Bitter Debate*, MILWAUKEE J. SENTINEL, Mar. 10, 2011, http://www.jsonline.com/news/statepolitics/ 117735163.html.

[3] *See* Bill Glauber, Jason Stein & Patrick Marley, *Democrats Flee State To Avoid Vote on Budget Bill*, MILWAUKEE J. SENTINEL, Feb. 17, 2011, http://www.jsonline.com/news/statepolitics/ 116381289.html; Stein, Marley & Bergquist, *supra* note 2.

[4] *See* Bill Glauber & Don Walker, *Protesters Jam Capitol Square, Deriding Budget Bill*, MILWAUKEE J. SENTINEL, Feb. 26, 2011, http://www.jsonline.com/news/statepolitics/116982223.html.

[5] *See* Stein, Marley & Bergquist, *supra* note 2.

[6] *See* Craig Gilbert, *Recall Drives Could Make History*, MILWAUKEE J. SENTINEL, Mar. 6, 2011, http://www.jsonline.com/news/

(continued...)

off-year political activity,[7] the Right to Life PAC returned to the district court and asked the judge to partially lift the stay to hear its claim that the aggregate contribution limit in section 11.26(4) is unconstitutional. The Right to Life PAC hoped to win an injunction against the enforcement of the statute so that it could accept contributions from persons who would otherwise exceed the statutory limit in order to finance its political speech during the recall elections. The district court summarily denied the motion. The judge thought the rationale for *Pullman* abstention still applied "with equal force today."

The Right to Life PAC appealed and moved for an injunction pending appeal. On August 1, 2011, a motions panel granted the motion. The panel reasoned that the fate of GAB 1.28 in the *Wisconsin Prosperity Network* litigation would not affect the question whether section 11.26(4) is unconstitutional as applied to groups that engage in independent expenditures for political speech. *See Wis. Right to Life State Political Action*

---

[6] (...continued)
statepolitics/117501513.html; Tom Tolan, *Recalls Can Proceed, Dane County Judge Rules*, ALL POLITICS BLOG, MILWAUKEE J. SENTINEL, July 8, 2011, http://www.jsonline.com/blogs/news/125236849.html.

[7] *See* Craig Gilbert, *State Recall Movement Stands Alone in U.S. History*, NEWS AND OPINION BLOG, MILWAUKEE J. SENTINEL, Mar. 12, 2011, http://www.jsonline.com/blogs/news/117804138.html.

*Comm. v. Vocke, et al.*, No. 11-2623, at 3 (7th Cir. Aug. 1, 2011). The panel also concluded that the constitutional claim was reasonably likely to succeed on the merits, and because First Amendment violations "'are presumed to constitute irreparable injuries,'" *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)), entered an order enjoining the enforcement of section 11.26(4) pending appeal. *Wis. Right to Life State PAC*, No. 11-2566, at 3. This interim order blocks enforcement of the statute to the extent that it applies to contributions to organizations, like the Right to Life PAC, that engage in independent (i.e., "noncoordinated") expenditures for political speech. *Id.* We expedited the appeal.

## II. Analysis

Although the Right to Life PAC challenged a number of Wisconsin's campaign-finance statutes and regulations, this appeal is limited to section 11.26(4), which provides:

> No individual may make any contribution or contributions to all candidates for state and local offices and to any individuals who or committees which are subject to a registration requirement under s. 11.05, including legislative campaign committees of a political party, to the extent of more than a total of $10,000 in any calendar year.

WIS. STAT. § 11.26(4). Before the recall elections last summer, the Right to Life PAC sought relief from the district

court's abstention order for the limited purpose of pursuing its motion for an injunction against the enforcement of section 11.26(4). The district court declined to lift the stay.

The court's order had the effect of denying an injunction, so immediate appeal is proper under 28 U.S.C. § 1292(a)(1). *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 83-84 (1981); *Clean Air Coordinating Comm. v. Roth-Adam Fuel Co.*, 465 F.2d 323, 325 (7th Cir. 1972) (court order imposing a stay "in effect constituted the refusal of a preliminary injunction within the meaning of 28 U.S.C. § 1292(a)(1)," permitting interlocutory appeal). In addition, abstention orders are immediately appealable under 28 U.S.C. § 1291 based on the collateral-order doctrine. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 714-15 (1996); *Med. Assurance Co. v. Hellman*, 610 F.3d 371, 376-77 (7th Cir. 2010); *In re Doctors Hosp. of Hyde Park, Inc.*, 337 F.3d 951, 954 (7th Cir. 2003).

There are some preliminary procedural hurdles to clear before we address the merits. The defendants have lodged jurisdictional objections based on standing, ripeness, and mootness. They also maintain that *Pullman* abstention was proper, which if correct is a nonjurisdictional barrier to our reaching the merits.

## A. Standing, Ripeness, Mootness

We begin with the jurisdictional issues, which we would examine independently even if the defendants had not raised them. *See Dexia Credit Local v. Rogan*, 602 F.3d 879,

883 (7th Cir. 2010). The defendants have identified three possible jurisdictional defects—lack of standing, unripeness, and mootness—but on each point they are mistaken.

### 1. *Standing*

First up is standing. Article III of the Constitution limits the judicial power to "Cases" and "Controversies," U.S. CONST. art. III, § 2, a limitation that confines federal courts "to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009). The doctrine of standing enforces this constitutional limitation. *Ezell v. City of Chicago,* 651 F.3d 684, 695 (7th Cir. 2011). To establish standing, a plaintiff must show

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).

This is a pre-enforcement challenge; the Right to Life PAC need not risk prosecution or otherwise await enforcement of the statute in order to establish its standing to sue. *See Schirmer v. Nagode*, 621 F.3d 581, 586 (7th Cir. 2010). "Pre-enforcement challenges . . . are within

Article III." *Brandt v. Vill. of Winnetka, Ill.*, 612 F.3d 647, 649 (7th Cir. 2010). The "existence of a statute implies a threat to prosecute, so pre-enforcement challenges are proper [under Article III], because a probability of future injury counts as 'injury' for purposes of standing." *Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010). Section 11.26(4) restricts political speech and may be challenged prior to enforcement based on the chill it places on the exercise of First Amendment rights and the corresponding risk of self-censorship. *See Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-93 (1988); *Bauer*, 620 F.3d at 708-09. " 'The freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment.'" *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 776 (1978) (quoting *Thornhill v. Alabama*, 310 U.S. 88, 101-02 (1946)).

The defendants contend that because the Right to Life PAC does not itself make political contributions, section 11.26(4) does not apply to its conduct and therefore it does not have standing to sue. This argument is way off the mark. The statute imposes an aggregate $10,000 cap on the amount individuals may contribute to political candidates, parties, and political committees in any calendar year. Anyone who contributes to the Right to Life PAC is bound by this limitation, so section 11.26(4) operates to limit the contributions the committee may lawfully receive. To the extent that a contributor wants to donate more than the statute allows but refrains from doing so in order to avoid violating the statute, the committee itself is injured.

The Right to Life PAC has identified two contributors in this category and plausibly claims there are more. Terry and Mary Kohler filed declarations attesting to their continuing intention to contribute to the Right to Life PAC in amounts larger than the statutory aggregate limit—not just in 2010, when this lawsuit was filed, but also in the future. But for the operation of section 11.26(4), they would do so. These injuries are easily sufficient to give the Right to Life PAC standing to bring this pre-enforcement challenge to the statute.[8] *See EMILY's List v. FEC*, 581 F.3d 1, 4-5 & n.1 (D.C. Cir. 2009) (Contribution limits can injure "contributee" organizations that are forbidden from receiving contributions in excess of the statutory limit.).

---

[8] Section 11.60(1) of the *Wisconsin Statutes* subjects anyone who violates Wisconsin election laws to a civil penalty of up to $500. Section 11.60(3) provides that any person or group violating contribution limitations may be required to forfeit three times the amount of the contribution or three times the portion that was illegally contributed. Section 11.61(1)(b) provides that anyone who intentionally violates section 11.26 is guilty of a Class I felony if the amount is over $100. These statutes subject contributors to potential civil and criminal penalties for violating the contribution limit, and the Right to Life PAC may be subject to liability for conspiracy to violate Wisconsin's election laws. *See, e.g., In re Disciplinary Proceedings Against Chvala*, 730 N.W.2d 648, 649-50 (Wis. 2007) (disciplinary proceeding involving attorney who previously pleaded guilty to a conspiracy to violate the contribution limitations in section 11.26).

In addition to its own Article III injury, the Right to Life PAC has standing to sue to vindicate the political-speech rights of its contributors. *See, e.g.*, *U.S. Dep't of Labor v. Triplett*, 494 U.S. 715, 720-21 (1990) (allowing attorney to challenge fee restrictions based on black-lung claimants' due-process right to legal representation); *Craig v. Boren*, 429 U.S. 190, 195 (1976) (allowing beer vendor to challenge alcohol regulation based on patrons' equal-protection rights); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 536 (1925) (allowing private schools to assert parents' rights to direct the education of their children); *Ezell*, 651 F.3d at 696 (allowing supplier of firing-range facilities to bring Second Amendment challenge to firing-range ban); *Majors v. Abell*, 317 F.3d 719, 722 (7th Cir. 2003) (candidate for public office may bring suit on behalf of the free-speech rights of his supporters).

## 2. *Ripeness*

The defendants also contend that the First Amendment claim is unripe. Ripeness doctrine is based on the Constitution's case-or-controversy requirements as well as discretionary prudential considerations. 13B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3532, at 365 (3d ed. 2008). Ripeness concerns may arise when a case involves uncertain or contingent events that may not occur as anticipated, or not occur at all. *Id.*; *see also Bauer*, 620 F.3d at 708-09. Whether a claim is ripe for adjudication depends on "'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court

consideration.'" *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

Claims that present purely legal issues are normally fit for judicial decision. *Abbott Labs.*, 387 U.S. at 149. And in challenges to laws that chill protected speech, the hardship of postponing judicial review weighs heavily in favor of hearing the case. *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 233 F.3d 981, 985-86 (7th Cir. 2000) ("CTS is . . . being chilled from engaging in speech . . . . Thus, the second part of the ripeness test is satisfied." (internal citation omitted)); *Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 689 (7th Cir. 1998) ("This kind of self-censorship is a substantial hardship within the meaning of the *Abbott Laboratories* test.").

This appeal focuses on a single merits question: Is the aggregate contribution cap in section 11.26(4) unconstitutional as applied to contributions to independent-expenditure committees? This is a legal issue and does not depend on contingent factual developments. As we explain in more detail later, the Supreme Court's decision in *Citizens United* resolves the First Amendment question as a matter of law. And because section 11.26(4) limits political speech, delaying a decision would leave in place a law that strikes at the heart of the First Amendment free-speech right. *See Ariz. Free Enter. Club's Freedom Club PAC v. Bennett,* 131 S. Ct. 2806, 2817 (2011) ("[T]he First Amendment has its fullest and most urgent application to speech uttered during a campaign for political

office." (internal quotation marks omitted)); *Citizens United*, 130 S. Ct. at 892 ("[P]olitical speech . . . is central to the meaning and purpose of the First Amendment.").

The defendants' argument about unripeness goes something like this: Under the terms of the injunction pending appeal, the Kohlers were permitted to make unlimited contributions to the Right to Life PAC during the recall elections last summer; their generalized desire to continue to do so in the future is too remote a contingency to support a ripe claim. But "in the future" is fairly understood to include the next election cycle, which is a scant few months away. Indeed, the body politic in Wisconsin is experiencing something of a perpetual campaign; efforts are currently underway to force the governor and four state senators to stand in recall elections.[9] And whether or not special recall elections are held, Wisconsin will hold general elections for state and local offices in April and November 2012. *See generally* WIS. CONST. art. VII, § 1; WIS. STAT. §§ 10.51 *et seq*. There is nothing uncertain or contingent about that. The First Amendment challenge to section 11.26(4) is ripe for judicial resolution.

---

[9] *See* Jason Stein & Patrick Marley, *Walker Recall Effort Kicks Off*, MILWAUKEE J. SENTINEL, Nov. 15, 2011, http://www.jsonline.com/ news/statepolitics/133810473.html; Patrick Marley, *Elections Panel Estimates $650,000 State Cost for Recall Efforts*, MILWAUKEE J. SENTINEL, Nov. 17, 2011, http://www.jsonline.com/news/ statepolitics/134087043.html.

### 3. *Mootness*

Relatedly, the defendants contend that the claim is moot because the summer 2011 recall elections are over. Mootness doctrine is also premised on constitutional requirements and prudential considerations. 13B WRIGHT ET AL., *supra*, § 3533, at 716. A case must present a live controversy at the time of filing, contain a live dispute through all stages of litigation, and the parties must continue to have a personal stake in the outcome of the lawsuit throughout its duration. *See Arizonans for Official English v. Arizona*, 520 U.S. 43, 67-68 (1997); *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990).

An established exception to mootness, often invoked in election-law cases, permits an otherwise moot claim to be heard if it is capable of repetition, yet evades review. The exception applies where: "'(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *FEC v. Wis. Right to Life*, 551 U.S. 449, 462 (2007) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)); *see also Davis v. FEC*, 554 U.S. 724, 736 (2008); *Wis. Right to Life*, 551 U.S. at 463; *Lee v. Keith*, 463 F.3d 763, 777 (7th Cir. 2006).

We need not take up the exception here. The conclusion of the 2011 recall elections does not moot this claim. As we have explained, the Right to Life PAC has at least two contributors who want to make contributions in excess of the $10,000 aggregate annual limit on a continuing basis in future elections. That's enough to support an ongoing live controversy.

## B. Abstention

The district court abstained and stayed this case to await the outcome of pending litigation in the state supreme court, a decision normally reviewed for abuse of discretion. *Int'l Coll. of Surgeons*, 153 F.3d at 360 (discussing *Pullman* abstension). Whether abstention applies, however, is a legal issue subject to de novo review. *See, e.g.*, *Med. Assurance Co.*, 610 F.3d at 378. If the district court made an error of law in applying abstention, it necessarily abused its discretion by refusing to lift the stay. *Cf. United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011) ("The district court abuses its discretion when it makes an error of law . . . .").

*Pullman* abstention is appropriate "only when (1) there is a substantial uncertainty as to the meaning of the state law and (2) there exists a reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Int'l Coll. of Surgeons*, 153 F.3d at 365. The purpose of *Pullman* abstention is to "avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." *Pullman*, 312 U.S. at 500. The doctrine is based on considerations of comity and federalism and applies when "the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716-17 (1996).

The district court stayed this case in its entirety based on the *Wisconsin Prosperity Network* litigation before the state supreme court. As we have noted, *Wisconsin Pros-*

*perity Network* challenges GAB 1.28, a newly amended campaign-finance rule that substantially expands the reach of Wisconsin's regulation of political speech. *Wis. Right to Life Comm., Inc. v. Myse*, No. 10-C-0669, 2010 WL 3732300 (E.D. Wis. Sept. 17, 2010) (order granting stay pending decision in *Wisconsin Prosperity Network*). The rule was controversial when promulgated in 2010 and immediately became the subject of several lawsuits.[10] The petition in *Wisconsin Prosperity Network* was filed on August 9, 2010, less than two weeks after GAB 1.28 was published. WISCONSIN COURT SYSTEM, SUPREME COURT AND COURT OF APPEALS ACCESS, http://wscca.wicourts.gov/ (enter "2010AP001937" in the "Appeal Number" field and select "Case History" button). On August 13, 2010, the Wisconsin Supreme Court ordered preliminary injunctive relief blocking enforcement of the new rule while the petition is pending. On November 30, 2010, the state supreme court took original jurisdiction over the case. Oral argument, initially scheduled for March 9, 2011, was postponed to September 6, 2011. The case was argued on that date and is now under advisement.

---

[10] In addition to this case in the Eastern District of Wisconsin and *Wisconsin Prosperity Network* in the state supreme court, an action challenging the rule was filed in federal court in the Western District of Wisconsin; that case, too, was stayed pending the outcome in *Wisconsin Prosperity Network*. *See Wis. Club for Growth, Inc. v. Myse*, No. 10-CV-427-WMC, 2010 WL 4024932 (W.D. Wis. Oct. 13, 2010) (order staying all proceedings).

Abstention questions under *Pullman* require a comparison of the substance of the federal- and state-court litigation. The petitioners in *Wisconsin Prosperity Network* have challenged the validity of GAB 1.28 on several grounds. They argue as an initial matter that the GAB lacked the authority to promulgate the rule. Their other claims are based on the First Amendment and its free-speech analog in the state constitution. *See* WIS. CONST. art. 1, § 3. In brief, they contend that GAB 1.28 impermissibly expands the categories of political speech (and by implication, the speakers) that are subject to the state's campaign-finance regulatory regime. They maintain that the new rule "extend[s] regulation to virtually any form of communication" and treats "a significant swath of issue advocacy as express advocacy." Pet'r Br. 5-6, *available at* http://wscca.wicourts.gov/ (select "filed documents" and enter "10AP1937" in the "Appeal Number" field). They advance several free-speech theories: that GAB 1.28 is unconstitutionally overbroad; that it impermissibly creates favored categories of speakers; and that it is not a narrowly tailored means of reducing quid pro quo corruption.

Some of the claims in this case also implicate GAB 1.28 and thus overlap with *Wisconsin Prosperity Network*. But the challenge to section 11.26(4) does not. Contributors to the Right to Life PAC will remain subject to section 11.26(4) and its aggregate annual contribution cap *whether or not* GAB 1.28 survives scrutiny in the Wisconsin Supreme Court. The $10,000 aggregate annual cap limits contributions to state and local candidates, political parties, and political committees. WIS. STAT.

§ 11.26(4). The Right to Life PAC is a political committee as defined in Wisconsin campaign-finance law. *Id.* § 11.01(4). A "contribution" for purposes of the aggregate limit means "[a] gift, subscription, loan, advance, or deposit of money or anything of value . . . made for political purposes." *Id.* § 11.01(6)(a)(1). A contribution is considered made for "political purposes" when it is made "for the purpose of influencing the election or nomination for election of any individual to state or local office, for the purpose of influencing the recall from or retention in office of an individual holding a state or local office," including the "making of a communication which expressly advocates the election, defeat, recall or retention of a clearly identified candidate." *Id.* § 11.01(16), (16)(a)(1).

The new GAB rule may have impermissibly expanded the reach of these and other statutes (that's the question before the state supreme court), but it certainly did not *narrow* their application. As such, the outcome in *Wisconsin Prosperity Network* will have no effect on the federal constitutional question raised here. Whether GAB 1.28 is invalidated *or* upheld, section 11.26(4) will continue to apply to the contributions the Right to Life PAC may receive. Because the challenge to the statutory aggregate contribution limit will be unaffected by the Wisconsin Supreme Court's decision in *Wisconsin Prosperity Network*, there is no "reasonable probability that the state court's clarification of state law might obviate the need for a federal constitutional ruling." *Int'l Coll. of Surgeons*, 153 F.3d at 365. Accordingly,

the district court's reliance on *Pullman* abstention was an error of law and necessarily an abuse of discretion.

### C. Wisconsin's Limit on Contributions to Independent-Expenditure Committees

We come at last to the merits. Does the First Amendment prohibit Wisconsin from applying section 11.26(4), the $10,000 aggregate annual contribution limit, to contributions to organizations engaged only in independent expenditures for political speech?[11] As we have noted, this is a legal issue, and resolving it does not require an evidentiary record. So although the district court did not address the question, we may decide it here.

"There is practically universal agreement that a major purpose of the First Amendment was to protect the free discussion of governmental affairs, includ[ing] discussion[] of candidates." *Ariz. Free Enterprise*, 131 S. Ct. at 2828 (internal quotation marks omitted). The free flow of political speech "is central to the meaning and purpose of the First Amendment." *Citizens United*, 130 S. Ct. at 892. In our system the individual free-speech right has structural significance; unencumbered discussion about political candidates and issues is "integral to the opera-

---

[11] The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. CONST. amend. I, and applies to the states through Section 1 of the Fourteenth Amendment, U.S. CONST. amend. XIV, § 1. *See Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 707 (1931).

tion of the system of government established by our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United*, 130 S. Ct. at 898. For these reasons, most laws that burden political speech are subject to rigorous judicial review. "Laws that burden political speech are 'subject to strict scrutiny,' which requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Id.* (quoting *Wis. Right to Life*, 551 U.S. at 464).

Ever since *Buckley*, however, the Supreme Court has drawn a distinction between restrictions on *expenditures* for political speech and restrictions on *contributions* to candidates. *See Ariz. Free Enterprise*, 131 S. Ct. at 2817; *Citizens United*, 130 S. Ct. at 901-02; *FEC v. Colo. Republican Fed. Campaign Comm.*, 533 U.S. 431, 437 (2001); *Buckley*, 424 U.S. at 20-21. Although "[s]pending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association," *Colo. Republican*, 533 U.S. at 440, the Court has generally applied a more lenient standard of review to campaign-finance limits on contributions.

*Buckley* held that limits on contributions to a candidate's campaign do not burden speech and political-association rights to the same degree as limits on election expenditures; this kind of campaign-finance regulation need only satisfy a form of intermediate scrutiny.

424 U.S. at 23-25. Campaign contribution limits are generally permissible if the government can establish that they are "closely drawn" to serve a "sufficiently important interest." *Id.* at 25; *see also Ariz. Free Enterprise*, 131 S. Ct. at 2817; *Davis*, 554 U.S. at 737; *Randall v. Sorrell*, 548 U.S. 230, 247 (2006); *Colo. Republican*, 533 U.S. at 446. Applying this less-demanding standard of review, *Buckley* upheld limits on direct contributions to candidates based on the strength of the government's interest in preventing quid pro quo corruption or the appearance of corruption. *Buckley*, 424 U.S. at 26-27; *see also Colo. Republican*, 533 U.S. at 456 (applying the intermediate standard to uphold caps on coordinated party expenditures on the theory that expenditures coordinated between party and candidate function like contributions to candidates).

Political expenditures stand on a different footing. Expenditure limits "impose significantly more severe restrictions on protected freedoms of political expression and association." *Buckley*, 424 U.S. at 23. "A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.* at 19. Because "[p]olitical speech is indispensable to decisionmaking in a democracy" and "[a]ll speakers . . . use money amassed from the economic marketplace to fund their speech," government-imposed burdens on political *expenditures* suppress speech quite directly and raise core First Amendment concerns. *Citizens United*, 130 S. Ct. at 904-05 (internal quotation marks omitted). Accordingly, laws

that burden *spending* for political speech—whether candidate spending *or* independent spending—get strict scrutiny and usually flunk. *See, e.g.*, *Ariz. Free Enterprise*, 131 S. Ct. at 2817-18 (collecting cases); *Citizens United*, 130 S. Ct. at 896-99; *Davis*, 554 U.S. at 740-44; *Colo. Republican*, 533 U.S. at 441-42; *Buckley*, 424 U.S. at 55-56.

Finally, the Court has observed that "preventing corruption or the appearance of corruption [is] the only legitimate and compelling government interest[] thus far identified for restricting campaign finances." *FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985). Importantly for our purposes here, *Citizens United* made it clear that the government's interest in preventing actual or apparent corruption—an interest generally strong enough to justify *some* limits on contributions to candidates—cannot be used to justify restrictions on independent expenditures. 130 S. Ct. at 909 ("[W]e now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption.").

As we have explained, there is a "fundamental constitutional difference between money *spent* to advertise one's views independently of the candidate's campaign and money *contributed* to the candidate to be spent on his campaign." *Nat'l Conservative PAC*, 470 U.S. at 497 (emphasis added); *Randall*, 548 U.S. at 241-42. When *Buckley* "identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." *Citizens United*, 130 S. Ct. at 909-10 (citing

*McConnell v. FEC*, 540 U.S. 93, 296-98 (opinion of Kennedy, J.)); *see also Nat'l Conservative PAC*, 470 U.S. at 497.

The threat of quid pro quo corruption does not arise when independent groups spend money on political speech. "By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate." *Citizens United*, 130 S. Ct. at 910. "The separation between candidates and independent expenditure groups negates the possibility that independent expenditures will result in the sort of *quid pro quo* corruption with which [the Court's] case law is concerned." *Ariz. Free Enterprise*, 131 S. Ct. at 2826-27. In short, "[t]he candidate-funding circuit is broken." *Id.* at 2826. *Citizens United* thus held as a categorical matter that "independent expenditures do not lead to, or create the appearance of, *quid pro quo* corruption." 130 S. Ct. at 910.

It's worth pausing here to reiterate that preventing actual or apparent quid pro quo corruption is the *only* interest the Supreme Court has recognized as sufficient to justify campaign-finance restrictions. Over time, various other justifications for restricting political speech have been offered—equalization of viewpoints, combating distortion, leveling electoral opportunity, encouraging the use of public financing, and reducing the appearance of favoritism and undue political access or influence—but the Court has repudiated them all. *See, e.g., Ariz. Free Enterprise*, 131 S. Ct. at 2825-29 (collecting cases); *see also Citizens United,* 130 S. Ct. at 902-11 (same); *Nat'l Conservative PAC*, 470 U.S. at 496-97. As such, after

*Citizens United* there is *no* valid governmental interest sufficient to justify imposing limits on fundraising by independent-expenditure organizations.

It follows, then, as a matter of law and logic, that Wisconsin's $10,000 aggregate annual contribution limit is unconstitutional as applied to organizations, like the Right to Life PAC, that engage only in independent expenditures for political speech. This is true even though the statute limits *contributions,* not *expenditures*. Whether strict scrutiny or the intermediate "closely drawn" standard applies, the anticorruption rationale cannot serve as a justification for limiting fundraising by groups that engage in independent spending on political speech. No other justification for limits on political speech has been recognized, and none is offered here.

The D.C. Circuit reached just this conclusion in a decision invalidating a federal aggregate contribution limit as applied to contributions made to "independent expenditure-only organizations." *SpeechNow.org v. FEC*, 599 F.3d 686, 695-96 (2010). The court noted that where contributions to independent-expenditure groups are concerned, *Citizens United* "effectively held that there is no corrupting 'quid' for which a candidate might in exchange offer a corrupt 'quo.'" *Id.* at 694-95. This rather simplified the task of weighing the competing interests. *Id.* at 695. To justify limiting contributions to independent-expenditure groups, the government needed "a countervailing interest that outweighs the limit's burden on the exercise of First Amendment rights." *Id.* at 692. Only one such interest has ever been

recognized: preventing corruption or the appearance of corruption. *Id.* Because *Citizens United* held "as a matter of law that independent expenditures do not corrupt or create the appearance of *quid pro quo* corruption," it followed inexorably that "contributions to groups that make only independent expenditures also cannot corrupt or create the appearance of corruption." *Id.* at 694. Without an anticorruption rationale, the government was left empty-handed; the court held that as applied to independent-expenditure groups, the federal contribution limit was unjustified under either strict scrutiny *or* the more relaxed "closely drawn" standard. As the D.C. Circuit aptly put it, "'something . . . outweighs nothing every time.'" *Id.* at 695 (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989)).

Other circuits are in accord. For example, in *Long Beach Area Chamber of Commerce v. City of Long Beach*, 603 F.3d 684, 687 (9th Cir. 2010), the Ninth Circuit considered a challenge to a city ordinance prohibiting persons or groups engaged in independent expenditures from accepting contributions above specified limits. The court invalidated the ordinance, relying on *Citizens United* to hold that contributions for independent expenditures pose no threat of corruption. *Id.* at 698-99; *see also Thalheimer v. City of San Diego*, 645 F.3d 1109, 1121 (9th Cir. 2011) (applying *Long Beach* to invalidate a municipal ordinance limiting contributions to independent-expenditure committees). The Fourth Circuit reached a similar conclusion even before *Citizens United*. *See N.C. Right to Life, Inc. v. Leake*, 525 F.3d 274, 293 (4th

Cir. 2008) (holding a statute limiting contributions to independent-expenditure political committee uncon-stitutional); *see also EMILY's List v. FEC*, 581 F.3d 1, 16-19 (D.C. Cir. 2009) (holding, pre-*Citizens United*, that because "[d]onations to and spending by a non-profit [independent-expenditure organization] cannot corrupt a candidate or officeholder," federal regulatory limits on contributions to such organizations are unconstitu-tional (emphasis omitted)).

The defendants have no valid response to this line of authority. They argue only that large contributions to independent-expenditure groups create the appearance of corruption "in more indirect ways"—for example, through "the proverbial 'wink or nod' between donor and candidate regarding the donor's 'uncoordinated' beyond-limits contribution to an independent ex-penditure political committee." They maintain that pre-venting the *indirect* appearance of corruption is enough to satisfy the intermediate standard of review. This argu-ment is foreclosed by *Citizens United*. As a categorical matter, independent expenditures "do not give rise to corruption or the appearance of corruption." *Citizens United*, 130 S. Ct. at 909. Moreover, to the extent that the defendants' "wink or nod" hypothetical implies collusion between a candidate and an independent com-mittee, it suggests only that the independent committee is not truly independent. If that's true, the committee would not qualify for the free-speech safe harbor for independent expenditures; the First Amendment permits the government to regulate *coordinated* expendi-tures. *Colo. Republican*, 533 U.S. at 465 ("[A political]

party's coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of contribution limits.").

Furthermore, the Supreme Court has firmly rejected the argument that burdens on political speech might be justified based on their tendency to *indirectly* serve the government's anticorruption interest. *Ariz. Free Enterprise*, 131 S. Ct. at 2827 ("[T]he fact that burdening constitutionally protected speech might indirectly serve the State's anticorruption interest, by encouraging candidates to take public financing, does not establish the constitutionality of the matching funds provision."). That's the unmistakable upshot of the Court's categorical holding in *Citizens United* that independent expenditures do not corrupt or appear to corrupt.

Accordingly, we conclude that applying section 11.26(4), the $10,000 aggregate annual contribution cap, to contributions to independent-expenditure committees like the Right to Life PAC violates the First Amendment. We therefore VACATE the district court's abstention order for the limited purpose of allowing this challenge to section 11.26(4) and REMAND with instructions to enter a permanent injunction enjoining the enforcement of section 11.26(4) as applied to contributions to independent-expenditure committees.