In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-1473

LORETTA CAPEHEART,

*Plaintiff-Appellant,*

*v.*

MELVIN C. TERRELL, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-cv-01423—**Blanche M. Manning**, *Judge.*

ARGUED DECEMBER 8, 2011—DECIDED AUGUST 29, 2012

Before MANION, ROVNER, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Loretta Capeheart is a tenured Justice Studies professor at Northeastern Illinois University and an outspoken critic of the university on a number of issues, including its failure to hire more Latino professors and its willingness to host military and CIA recruiters at campus job fairs. She believes that university officials have defamed her, refused to make

her department chair, and denied her an award (among other things) because of her speech. In her federal claim, Capeheart has sued Sharon Hahs and Lawrence Frank in their official capacities as Northeastern's president and provost, asking for an injunction against future retaliation in violation of the First Amendment. In addition to her federal claim under 42 U.S.C. § 1983, she has asserted a variety of claims under Illinois law seeking damages and an injunction. The district court granted the defendants' motion for summary judgment and declined to exercise supplemental jurisdiction over the remaining state-law claims.

The diverse events underlying Capeheart's claims started in April 2006, when she joined two members of the Anti-War Club to protest military recruiters at a campus job fair. A recruiter asked Capeheart and the students to move, but they refused. The Dean of Students, Michael Kelly, called the campus police to stop the protest. After a conversation with Kelly, one of the officers told her there would be, as Capeheart puts it, an "employment action" by the university if she persisted. At that point, Capeheart left the job fair. Someone in Kelly's office prepared a report about the incident, recommending that the protestors pay restitution to the placement office for refunds on registration fees it paid to employers at the fair unhappy about the disturbance. The report also said that someone spoke to an associate provost "about potential administrative follow up with Capeheart."

In September 2006, Capeheart was on a panel before the Illinois Legislative Latino Caucus. She criticized North-

eastern's failure to recruit more Latino faculty and its excessive spending on administrators as compared to faculty. Northeastern's provost, Frank, also addressed the Caucus. He agreed with Capeheart that more Latino faculty should be hired, but insisted that to do so the university would need more money. He was pleased that the Caucus was interested in Northeastern, and said "the more you know about us, I think the better . . . everybody will be; obviously we have big differences of opinion, particularly between Loretta and me."

In February 2007, a group of students protested a CIA recruiting event. The student-protesters were blocked from entering the seminar room where the event was happening because they hadn't registered. But one managed to get in anyway. Two students were arrested. Both students happened to be members of the Socialist Club, which Capeheart advises. There's no evidence that Capeheart organized the protest or was there, but she took an interest in it after the fact. She visited the campus police twice the day of the arrests, called university administrators to advocate for the students, requested meetings with administrators, sought support from the faculty union, and emailed complaints to administrators, faculty, and eventually the entire university expressing "deep concern" about the arrests.

She brought up the student arrests at a meeting of the Faculty Council on Student Affairs. She was concerned about backlash against the students and the Socialist Club, said that the vice president of student

affairs, Mervin Terrell, ignored her concerns, and that a student-made flyer accusing her of promoting the protest came from the placement office and was defamatory. Terrell, who has since retired, responded that he didn't think the problem was with the police but "with the students and their advisor." He went on to say that "Dr. Capeheart was actually a subject of interest for the police because a student had filed stalking charges against her with the university police." Terrell wrote to Capeheart two days later to apologize for the stalking comment. His comment, however inappropriate, was prompted by a student's written complaint that she was chased by Capeheart when handing out information about Capeheart's group. Capeheart complained to the affirmative action office about Terrell's comment. There was an investigation that concluded Terrell had acted "inappropriately" by publicly discussing the student complaint. (The student who made the complaint eventually amended her statement to name a student associated with the Socialist Club instead of Capeheart.)

Each year, professors at Northeastern can apply for a Faculty Excellence Award, which includes a $1,000 prize. Many professors from the same department may win the award, but in 2007 Capeheart was not among them. Frank reviewed the denial and had the power to overrule it, but decided not to because, he said, Capeheart's book was not yet in print. Another professor in Justice Studies who was denied the award successfully petitioned Frank to overrule the denial; his book had been published, but, Capeheart argues, was less

award-worthy than hers because it is a collection of previously published articles. Capeheart did receive a Faculty Excellence Award in 2008, and she does not allege that she has been improperly denied an award since.

In the summer of 2007, Capeheart learned that Justice Studies was going to separate from Social Work to become an independent department. The program coordinator for Justice Studies resigned and so the soon-to-be-created department would need a new head, and Capeheart wanted the job. The Justice Studies faculty met to vote for their nominee: four voted for Capeheart, one voted against, and one abstained. The administration almost always appoints the department's choice as chair, but not this time. The decision was Frank's. According to Capeheart, Frank told her that she was not competent to be chair. He eventually offered to make Capeheart associate chair, but she declined. When Justice Studies became an independent department, a search committee selected a chair from outside the department.

Finally, in 2008, Hahs circulated a proposed policy on demonstrations. Her proposal included recommendations that leaflets be submitted to the administration one week in advance, that reservations to demonstrate be made one week in advance, that all demonstrations happen between 8:30 a.m. and 4:30 p.m., and prohibiting "disturbances." The campus groups that reviewed the proposed policy objected, and Hahs withdrew her proposal and has not renewed it.

These events prompted Capeheart to seek an injunction under § 1983 against Hahs and Frank in their official

capacities. In her complaint, Capeheart sought an injunction against First Amendment retaliation by Hahs and Frank and asked to be appointed chair (or department coordinator, which is the equivalent of chair for a department or section that is a subunit of another department, as Justice Studies was). In response to the defendants' motion for summary judgment, Capeheart withdrew her demand to be made chair. That change, the defendants argue, mooted her one and only federal claim. We agree that the change in Capeheart's requested relief creates a jurisdictional problem, although we do not think that it is just (or principally) one of mootness. A claim is moot if it no longer presents a live dispute between the parties. *Wis. Right to Life State PAC v. Bartland*, 664 F.3d 139, 149 (7th Cir. 2011). It is true that one aspect of Capeheart's claim is no longer "live"; she has given it up. But, from the outset, Capeheart has requested more than just appointment as chair, although we admit that it has been a bit of a puzzle to figure out exactly what. But with help from her counsel at oral argument, it is now clear that Capeheart seeks to enjoin the defendants from (1) instituting Hahs' proposed demonstration policy and (2) retaliating against her for her speech. With regard to (2), Capeheart wants to enjoin Hahs and Frank from retaliating against her by depriving her of positions and awards to which (by merit or election) she is entitled.

The question we have about our jurisdiction is thus not whether it is too late to be able to grant Capeheart injunctive relief, and so whether her claim is moot, but whether it is too early to consider her claim as it is now.

*See Bauer v. Shepard*, 620 F.3d 704, 708 (7th Cir. 2010). Our concern, in other words, is that Capeheart's federal claim is unripe, that it "involves uncertain or contingent events that may not occur as anticipated, or not occur at all." *Wis. Right to Life*, 664 F.3d at 148. We cannot reach the merits of Capeheart's claim for prospective relief, if "the possibility of any future injury [is] too remote." *Piggee v. Carl Sandburg College*, 464 F.3d 667, 673 (7th Cir. 2006). And we will conclude that the possibility of injury is too remote if she fails to show that she is "immediately in danger of sustaining some direct injury" that is "'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *Golden v. Zwickler*, 394 U.S. 103, 109-10 (1969)).

Regarding Hahs' proposed demonstration policy, Capeheart's claim is indeed too conjectural. Although it is often appropriate to consider a pre-enforcement challenge to a law or policy that is either in force, *e.g.*, *Bauer*, 620 F.3d at 708 (citing cases), or once was, *Milwaukee Police Ass'n v. Jones*, 192 F.3d 742, 746-47 (7th Cir. 1999), the same cannot be said about a pre-*enactment* challenge, *see Fed'n of Adver. Indus. Reps., Inc. v. City of Chicago*, 326 F.3d 924, 932 (7th Cir. 2003). One obvious reason for that difference is that an existing policy or law poses a continuing threat of enforcement, *see Wis. Right to Life*, 664 F.3d at 147, and some policies are likely to be reinstated as soon as the pressure from litigation or a court's order is off, *see Milwaukee Police Ass'n*, 192 F.3d at 746-47, and laws too, *see City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 n.11 (1982), but

a proposed policy may never come into force and, even if it does, it could well change during the process that takes it from a possible rule to an actual one.

In some instances, no collaborative process may be required to make a policy effective, and so it might be appropriate to view a proposed policy, if sufficiently concrete, like a withdrawn one likely to go into effect unchanged. Even if, as Capeheart argues, that begins to describe this case, because of Hahs' (alleged) power to implement policies unilaterally, there still must be *some* chance the policy will actually go into effect. Here we see none. In 2008, Hahs proposed the challenged policy, it was circulated as a proposal, criticized, and withdrawn. Nothing in the record hints that it will resurface. And if someday a version of Hahs' demonstration policy is enacted, an appropriate plaintiff can test it in federal court without asking the court to guess at the hypothetical harms of a hypothetical rule.

That leaves Capeheart's request for an injunction to prohibit Hahs or Frank from retaliating against her and, specifically, from depriving her of awards or positions because of her speech. Recall, in 2007, Frank refused to override a committee decision not to award her a Faculty Excellence Award, although he did so for another professor in a similar situation. That same year, Frank refused to appoint her chair of Justice Studies even though she won the department vote for the position. Based principally on those events, Capeheart seeks an injunction to prevent retaliation in the future. As things stand now, however, we think that her claim

is too speculative, the prospect of similar harms too remote, to allow us to do that.

Twice in 2007 Frank exercised his discretion against Capeheart, and we make no judgment about whether those decisions were retaliatory; we only conclude that those two incidents do not constitute a pattern or course of retaliatory conduct such that Capeheart is in "immediate" danger of suffering future injuries. It is not enough that a few interactions with Frank and Hahs has caused Capeheart to fear retaliation. We are concerned about her speech being chilled, but we cannot entertain her claim based on her outlook alone; we must find a solid basis for her apprehension in the record. Further, we believe that "withholding court consideration" will not be a "hardship" for Capeheart, who may still proceed against Frank, Hahs, and Terrell for damages and an injunction on her state-law claims. *See Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004) (quoting *Texas v. United States*, 523 U.S. 296, 301 (1998)).

Our conclusion that Capeheart has not established a real prospect of retaliation by the official-capacity defendants may seem like an ungenerous view of the record. But most of the actions that Capeheart uses to support her position have little to do with the president or provost or anyone "in concert" with them. Students did things she did not like. Terrell is a major player in her story, but he retired four years ago. It would be wrong, we think, to stretch our jurisdiction based on a guess that Capeheart will improperly be denied an award as retaliation for her speech, as she believes she

once was. And we will not speculate about whether a position she wants will become available, that she will be entitled to the position, after an election perhaps, and that the president or provost or someone acting on their orders will deny it to her because of her speech. *See Bauer*, 620 F.3d at 709. If Capeheart's guess is right and she is targeted for her speech, she can again seek a federal forum for her claims.

In sum, we recognize that Capeheart's retaliation claims are serious, and our intention is not to belittle them. The question for us now, however, is whether the prospect of retaliation by Hahs or Frank is more than conjecture. We conclude that it is not.

The district court (incorrectly) reached the merits of Capeheart's federal claim and granted the defendants' motion for summary judgment. It then declined to exercise supplemental jurisdiction over the remaining state-law claims and dismissed them without prejudice. We review the district court's decision not to exercise supplemental jurisdiction for abuse of discretion. *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 906 (7th Cir. 2007). We do not apply a different standard or dismiss the supplemental state-law claims automatically just because our decision is based on unripeness rather than the merits. *See Rosado v. Wyman*, 397 U.S. 397, 403-05 (1970). And so this is different from a case where there was never federal jurisdiction or the plaintiff abandoned his federal claim, "which ordinarily requires dismissal of the entire case, including the supplemental claims." *Townsquare Media, Inc. v. Brill*, 652 F.3d 767, 773

(7th Cir. 2011). That said, "we will reverse the court's decision to relinquish supplemental jurisdiction over state-law claims 'only in extraordinary circumstances.'" *In re Repository Techs., Inc.*, 601 F.3d 710, 724-25 (7th Cir. 2010) (quoting *Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001)). And nothing about the district court's investment or the nature of Capeheart's state-law claims is so extraordinary to make its decision not to retain those claims an abuse of its discretion. *See* 28 U.S.C. § 1367(c)(3); *Garrity*, 479 F.3d at 906-07.

We therefore VACATE the district court's judgment, REMAND with instructions to DISMISS the federal claim as unripe, and AFFIRM its dismissal of Capeheart's supplemental claims.