In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2170

ROGER FLEMING,

*Plaintiff-Appellant*,

*v.*

LIVINGSTON COUNTY, ILLINOIS,
an Illinois Local Governmental Entity, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 08-CV-01174—**Joe Billy McDade**, *Judge*.

ARGUED JANUARY 6, 2012—DECIDED MARCH 28, 2012

Before MANION and WILLIAMS, *Circuit Judges*, and
CASTILLO, *District Judge*.[*]

MANION, *Circuit Judge.* Roger Fleming was arrested
in the early morning hours of August 4, 2006, in Flanagan,

[*] The Honorable Ruben Castillo, of the Northern District
of Illinois, is sitting by designation.

Illinois for allegedly breaking into a home and fondling two teenaged girls. The state filed criminal charges against Fleming, but those charges were eventually dropped for lack of sufficient evidence. Fleming then filed a civil suit in July 2008, asserting that multiple Livingston County officials were liable for false arrest, withholding exculpatory evidence, and denying Fleming necessary medical care while he was incarcerated. Eventually, the district court dismissed several of Fleming's state-law claims and Fleming voluntarily dismissed all but three defendants. This left only Fleming's claim against Sheriff's Deputy David Turner for false arrest under 42 U.S.C. § 1983, and Fleming's indemnification claim against Sheriff Robert McCarty and Livingston County under the Illinois Local Governmental and Governmental Employees Tort Immunity Act. The district court granted summary judgment in favor of the defendants on both claims. For the reasons that follow, we affirm.

## I.

In the early morning hours of August 4, 2006, Deputy Turner was on foot patrol in Flanagan, Illinois, a town in Livingston County of a little more than 1,000 people. While on patrol, Turner noticed a man exit a house about a block away from Turner's position. That man, Thomas Troxel, saw Turner and began walking down

the street toward him[1]; Turner in turn began walking toward Troxel. Troxel reported to Turner that someone had just broken into Troxel's home and had fondled his two teenaged daughters, Haleigh and Danielle Troxel, who had been sleeping in the living room.

What followed immediately thereafter is not entirely clear from the record: Turner testified that he went with Troxel back to Troxel's home, and Troxel testified that Turner first went to retrieve his police cruiser and conducted a cursory search for the perpetrator before coming to Troxel's home. We are not concerned with this minor contradiction, however, because the time disparity between the two narratives is inconsequential and because the events that follow are largely undisputed. The record is clear that, a short time after meeting Troxel in the middle of the street, Turner went to Troxel's home to interview Troxel's daughters.

On Turner's arrival, Haleigh Troxel told Turner that she, Danielle, and their father were asleep in the living room of their house. Haleigh was awakened by a man who was fondling her, but believed that she was dreaming and therefore rolled over and went back to sleep. A few moments later she was awakened by Danielle yelling, "What are you doing?" Danielle's shout also awakened Thomas Troxel, who then heard Haleigh

---

[1] At first blush, one might question why Troxel was ostensibly not in a hurry to seek help. Apparently, Troxel had undergone several bypass surgeries and could not run.

say, "Dad, someone's in the house." In the midst of the commotion, the intruder fled through the kitchen—where a light had remained on—and out the back door. As he fled, Haleigh caught a glimpse of the intruder from the back; she reported to Turner that he was wearing camouflage cargo shorts, a dark baseball cap, and, according to Turner, a t-shirt.[2]

After briefly speaking to Troxel's daughters and acquiring a physical description of the alleged intruder, Turner left the house and began searching for the suspect in his police cruiser. Soon thereafter, he saw a mobile home with its porch light on, situated approximately a half block north of the Troxel home on the same side of the street. Turner stopped at the mobile home, went to the door, and knocked. There was no answer, but as Turner was getting ready to leave he noticed a man walking a dog in an alleyway behind the mobile home. The man—who turned out to be Appellant Roger Fleming—was heading south (in the direction of the Troxel home), but Turner did not immediately stop him. Fleming left the alleyway and veered toward an intersection approximately one block to the west of the Troxel home. Turner, following in his cruiser, intercepted Fleming at the intersection. At the time Turner stopped him, Fleming was wearing

---

[2]  Haleigh also stated in an affidavit filed in this lawsuit that she told Turner the man was wearing a "t-shirt," but later in her deposition she stated that she had told Turner the intruder was wearing a "light colored t-shirt."

camouflage cargo shorts, a black baseball cap, and a dark blue t-shirt. No one else was in the area.

Turner explained to Fleming that he was investigating a break-in and assault, and asked whether Fleming would stay with him while he continued the investigation. Fleming agreed, tied his dog to a nearby fire hydrant, and climbed in the back of Turner's cruiser. Turner called for backup, and another deputy arrived soon thereafter and parked his car behind Turner's. That deputy stayed with Fleming while Turner walked back to the Troxel home.

On returning to the Troxel home, Turner again interviewed the two assault victims. Haleigh Troxel confirmed that the intruder was a white male who was wearing camouflage cargo shorts, a t-shirt, and a dark baseball cap. Based on Haleigh's description, the location at which Turner discovered Fleming, and the short amount of time between when the alleged break-in and assaults occurred and the time Turner intercepted Fleming, Turner believed that he had probable cause to formally arrest Fleming for residential burglary and sexual assault. Although Turner believed he had probable cause to arrest Fleming, he nevertheless sought confirmation from the state's attorney's office before making the felony arrest. Turner called assistant state's attorney Carey Luckman and relayed a summary of the events. Turner testified that he told Luckman that the amount of time between Turner's first interaction with Thomas Troxel to when Turner saw Fleming walking his dog

was "two to three minutes, maybe two-and-a-half min-utes." Turner stated that this was merely an estimate, and Luckman testified that Turner had described the time period in "minutes." Based on the closeness in time between the alleged offense and Turner's initial sighting of Fleming, as well as Haleigh Troxel's descrip-tion that matched Fleming's appearance, Luckman con-cluded that Turner had probable cause to arrest Fleming.

Having received confirmation from the state's attorney that he had probable cause, Turner arrested Fleming for the offenses of residential burglary and sexual assault. Turner and other officers who had arrived on the scene then took the additional step of conducting a "show-up," where Haleigh Troxel viewed Fleming from the back under a streetlight. Haleigh iden-tified Fleming as the intruder. Fleming was then trans-ported to jail and charged with residential bur-glary, criminal trespass to residence, aggravated sexual assault, and attempted aggravated sexual assault.

The state court later dismissed the charges against Fleming for lack of evidence. Fleming then filed this suit in July 2008. Fleming alleged numerous injuries against multiple defendants under 42 U.S.C. § 1983, and Illinois state law. As noted above, however, the only claims before us on appeal are (1) a claim against Sheriff's Deputy David Turner for false arrest under 42 U.S.C. § 1983, and (2) an indemnification claim against Sheriff Robert McCarty and Livingston County under the Illinois Local Governmental and Governmental Em-ployees Tort Immunity Act, 745 Ill. Comp. Stat. 10/1-101 *et seq.*

The discovery deadline was originally set for February 12, 2010, but was extended to August 31, 2010, on the parties' joint motion to continue the deadline. On September 30, 2010—four weeks after the discovery deadline had passed—the defendants filed a motion for summary judgment, asserting both that Turner had probable cause to arrest Fleming and that, even if Turner was mistaken in his belief that he had probable cause, Turner was entitled to qualified immunity because his mistake was objectively reasonable. (The defendants also noted—and Fleming did not dispute—that if the court granted summary judgment in their favor on the false-arrest claim, the state indemnification claim necessarily failed.) Along with his memorandum in response to the defendants' summary judgment motion, Fleming submitted new evidence obtained after the close of discovery. This evidence was compiled by a previously nondisclosed witness, Mr. Harmon Cook, a private investigator, who had taken several photographs of relevant locations and conducted a re-creation of Deputy Turner's actions during the investigation. Cook averred that it took him 6 minutes and 50 seconds to complete all the actions undertaken by Turner, beginning with Turner's initial contact with Thomas Troxel and ending with Turner's discovery of Fleming in the alleyway—twice as long as Turner's estimate of two to three minutes. Using this evidence in his response, Fleming argued that the actual length of Turner's investigation precluded a reasonable probable cause determination.

The defendants objected to the timeliness of Fleming's newly submitted evidence and filed a motion to strike

both the evidence itself and the parts of Fleming's argument that were dependent on that evidence. The district court granted the motion, although it noted that, out of an abundance of caution, it would consider the evidence in reaching its summary judgment decision. The court granted the defendants' summary judgment motion (even while taking the untimely submitted evidence into account), holding that qualified immunity applied to Turner and, therefore, that Fleming's claims failed. Fleming now appeals.

## II.

On appeal, Fleming first argues that the district court erred in striking Cook's affidavit and photographs. There is no reason, however, to analyze this issue because it would be a purely superficial exercise: as noted above, in making its summary judgment ruling, out of an abundance of caution the district court considered the very evidence it struck. We would be hard-pressed to find that the district court abused its discretion in excluding this late-filed evidence—evidence which the defendants neither had the opportunity to challenge in discovery nor address in their summary judgment motion. But even considering this evidence, as the district court did, Fleming cannot succeed on his second challenge on appeal—a challenge to the district court's decision that the defendants were entitled to summary judgment based on qualified immunity.

We review a district court's granting of summary judgment *de novo*, viewing all facts and construing all

inferences in the light most favorable to the non-moving party. *Muhammed v. City of Chicago*, 316 F.3d 680, 682 (7th Cir. 2002) (citing *Outlaw v. Newkirk*, 259 F.3d 833, 836 (7th Cir. 2001)). We will affirm if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Section 1983 allows citizens whose constitutional rights have been violated by public officials to sue those officials in their individual capacities. *See Jenkins v. Keating*, 147 F.3d 577, 583 (7th Cir. 1998). In this case, Fleming alleges that Turner violated his Fourth Amendment right to be free from unreasonable searches and seizures by arresting Fleming without probable cause. Turner responds that he had probable cause to arrest Fleming or, at a minimum, that he was entitled to qualified immunity. When, as here, the defendants have raised a qualified immunity defense to a false-arrest claim, "we will review to determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998) (citations omitted).

## A.  Probable Cause

We first address the issue of whether Turner had probable cause to arrest Fleming. Indeed, if Turner actually did have probable cause to arrest Fleming, "then a Fourth

Amendment claim for false arrest is foreclosed." *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 679-80 (7th Cir. 2007) (citing *Morfin v. City of E. Chicago*, 349 F.3d 989, 997 (7th Cir. 2003)). "A police officer has probable cause to arrest when, at the moment the decision is made, the facts and circumstances within her knowledge and of which she has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999) (citations omitted). This standard "does not require that the officer's belief be correct or even more likely true than false, so long as it is reasonable." *Id.* (citing *Texas v. Brown*, 460 U.S. 730, 742 (1983)).

The district court held that it could not "definitively state that probable cause existed as a matter of law." The court noted two pieces of the factual record that were particularly problematic to Turner's probable-cause determination: first, that Haleigh Troxel testified at her deposition that she had reported to Turner that the intruder was wearing a light-colored t-shirt, but Fleming was wearing a dark-colored t-shirt when he was apprehended; and second, that Fleming had a dog with him when Turner first sighted him in the alleyway, but none of the Troxels mentioned the presence of a dog at the time the suspect broke in to their house.

Despite the district court's reticence to do so, Turner asks us to hold that probable cause existed as a matter of law. It is of course true that we may affirm the district court "on any ground that finds support in the

record." *Roland v. Langlois*, 945 F.2d 956, 962 n.11 (7th Cir. 1991) (citations omitted). But we typically reserve a further exploration of the factual record for instances in which "we do not specifically follow the reasoning of the district court." *Id.* Here, in opining about the lack of existence of probable cause, the district court merely cited the two factual discrepancies noted above; it did not expound on their significance. Rather, the district court spent the majority of its time analyzing Turner's qualified immunity defense, which ultimately led to the same summary judgment outcome. Because we believe that the district court's qualified immunity holding may be affirmed on its face, and thus that the granting of summary judgment was proper, we decline Turner's invitation to disturb the district court's decision to deny summary judgment on the issue of probable cause.

## B. Qualified Immunity

The question of whether Turner actually had probable cause to arrest Fleming is separate from the question relating to qualified immunity.[3] "Qualified immunity

---

[3] Fleming asserts that "the court's legal determination of qualified immunity must be deferred when there are triable issues of fact on the reasonableness of the police officer's conduct to await a jury determination of the disputed fact[s] . . . which informs the court's decision on qualified immunity."

(continued...)

protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known." *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009) (citations omitted). There is no question that Fleming's constitutional right to be free from arrest without probable cause was clearly established at the time of the incident. *Humphrey*, 148 F.3d at 725 (citing *Baker v. McCollan*, 443 U.S. 137, 142 (1979); *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975)). Yet "the corresponding doctrine of qualified immunity for police officers has also long been recognized." *Id.* (citing *Pierson v. Ray*, 386 U.S. 547, 555-58 (1967)). That corresponding doctrine provides that a defendant is entitled to qualified immunity in a false-arrest case when, if there is no probable cause, "a reasonable officer could have mistakenly believed that probable cause existed." *Id.* (citations omitted). Thus, as long as Turner reasonably, albeit possibly mistakenly, believed

---

[3] (...continued)

That was once the law of our circuit, *see Frazell v. Flanigan*, 102 F.3d 877, 886-87 (7th Cir. 1996) (citations omitted), but has long since been abandoned following the Supreme Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001). *See Marshall ex rel. Gossens v. Teske*, 284 F.3d 765, 772 (7th Cir. 2002) ("[E]ven in cases in which the question of qualified immunity is factually intertwined with the question of whether officers violated the Fourth Amendment . . . , judges must still make an immunity determination separate from the jury's finding on whether the officers violated the plaintiff's constitutional rights." (citing *Saucier*, 533 U.S. at 197)).

that probable cause existed to arrest Fleming, then Turner is entitled to qualified immunity. *Id.* This standard is often dubbed "arguable probable cause." *Id.* (citations omitted). Arguable probable cause is established "when 'a reasonable police officer in the same circumstances and with the same knowledge and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law.'" *Id.* (quoting *Gold v. City of Miami*, 121 F.3d 1442, 1445 (11th Cir. 1997)).

In this case there was certainly arguable probable cause. The undisputed evidence showed that within seven minutes of being informed of a possible break-in and assault, Turner spotted Fleming in an alleyway approximately one-half block from the crime scene. Fleming was the only person in the area and he substantially matched the description of the intruder that one of the victims had given to Turner—he was wearing a baseball cap, t-shirt, and camouflage cargo shorts. From this evidence, a police officer could have reasonably, if mistakenly, believed that probable cause existed to arrest Fleming. This is true even if Haleigh had described Turner's t-shirt as "light-colored" because witnesses often have minor details incorrect. *See Catlin*, 574 F.3d at 365-66 (affirming the grant of qualified immunity to police officers on a false-arrest claim where minor variations existed between the description given to the officers and the actual appearance of the suspect arrested, and stating that the officers were "required to show only the *reasonableness* of their belief that the

person they arrested was the person they were seeking; they [we]re not required to show that they knew *with certainty* that the person they arrested was the person they were seeking"). Significantly, before arresting Fleming, Turner contacted state's attorney Luckman and relayed this information to him. Luckman agreed that, based on the facts Turner presented, Turner had probable cause to arrest Fleming.

Fleming responds that qualified immunity is inappropriate because the evidence supports the conclusion that Turner fabricated evidence to gain the requisite probable cause to arrest Fleming. Specifically, Fleming claims that Cook's investigation revealed that Turner's investigation took seven minutes instead of the two to three minutes that Turner claimed, that Haleigh's testimony shows that the perpetrator was wearing a "light-colored" t-shirt, and that Turner could not have seen Fleming walking his dog in the alleyway from Turner's position on Fleming's porch, as Fleming had said. We take the latter point first. Contrary to Fleming's argument, Turner never testified that he was on Fleming's porch when Turner saw Fleming in the alleyway; rather, Turner testified that he noticed Fleming as he "was getting ready to leave." From a position just a few feet away in Fleming's driveway—where Turner's cruiser was parked—Turner could easily have noticed Fleming walking in the alleyway "a little to the south" of Turner's own location. Thus, there is no evidence calling into question Turner's statement that he saw Fleming walking his dog in the alleyway.

The disparity in time (two to three minutes versus seven minutes) and the t-shirt color are also insufficient to save Fleming's case for two reasons. First, to show that Turner fabricated evidence, Fleming needed to present evidence that Turner deliberately submitted false testimony or recklessly disregarded the truth. *Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1126 (9th Cir. 2002) (quoting *Hervey v. Estes*, 65 F.3d 784, 789-90 (9th Cir. 1995)). But Turner testified that the two-to-three-minute time-frame that he ascribed to his investigation was an "estimate," leaving plenty of room for an actual time period that was a few minutes greater. And there is no evidence that Turner deliberately falsified or recklessly disregarded the perpetrator's description. Second, even if Turner had fabricated evidence, that is not enough; rather, the falsifications must be "'material' to the finding of probable cause." *Id.* (quoting *Hervey*, 65 F.3d at 789)). And the test is an objective one for the court: we ask whether "the officer's behavior [in falsifying the evidence] has an effect on the ultimate issue" of whether the officer made a reasonable probable cause determination. *Hervey*, 65 F.3d at 789-90. Neither the claimed disparity in the t-shirt color, nor the longer, albeit still extraordinarily abbreviated, length of time between the assault and seeing Fleming, affects the arguable probable cause analysis. Indeed, even if Turner had falsified his testimony, because Fleming's attire substantially matched Haleigh's description and Fleming was the only person within one block of the crime scene within seven minutes of the alleged crime, Turner still

could have reasonably believed that he had probable cause to arrest Fleming.[4]

We also note that Turner's act in calling state's attorney Carey Luckman goes a long way toward solidifying his qualified immunity defense.[5] As we have stated before, "[c]onsulting a prosecutor may not give an officer absolute immunity from being sued for false arrest, but it goes far to establish qualified immunity. Otherwise the incentive for officers to consult prosecutors—a valuable screen against false arrest—would be greatly diminished." *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004) (citation omitted). Under these circumstances, Turner had arguable probable cause and was

---

[4] In challenging arguable probable cause, Fleming also points to the fact that he was walking a dog when spotted by Turner. But the proximity of Fleming's house to the scene would have left him plenty of time to flee the Troxels' house, return to his own house, discover that his dog needed to be walked, and then leave his house with the dog—all before Turner noticed him walking in the alleyway.

[5] Besides the phone call placed to Luckman, Turner took the additional precautionary step of conducting a "show-up," where Haleigh Troxel positively identified Fleming as the intruder. But the show-up occurred after both Turner's probable cause determination and Fleming's arrest; therefore, it was not part of the sequence of events that gave rise to the alleged harm in this case and we will not consider it in our inquiry. However, had the arrest taken place after Haleigh's positive identification there would certainly have been probable cause to arrest Fleming.

entitled to qualified immunity. In turn, Sheriff McCarty and Livingston County are entitled to summary judgment on the indemnification claims. *See* 745 Ill. Comp. Stat. 10/2-109 ("A local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable.").

## III.

The district court did not abuse its discretion in granting the defendants' motion to strike Fleming's untimely submitted evidence. Additionally, because a reasonable police officer in Turner's position could have believed that probable cause existed to arrest Fleming, the district court did not err in granting summary judgment to Turner on the basis of his qualified immunity defense. For these reasons, we AFFIRM.