In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1896

PAUL BURRITT,

*Plaintiff-Appellant*,

*v.*

LISA DITLEFSEN, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:12-cv-00909-wmc — **William M. Conley**, *Chief Judge.*

ARGUED NOVEMBER 2, 2015 — DECIDED NOVEMBER 30, 2015

Before BAUER, POSNER, and KANNE, *Circuit Judges.*

BAUER, *Circuit Judge.* Plaintiff-appellant, Paul Burritt ("Burritt"), appeals the district court's order granting summary judgment in favor of defendants-appellees, Lisa Ditlefsen ("Ditlefsen") and Polk County, on all of Burritt's causes of action, as well as the district court's denial of his Rule 59(e) motion. Burritt's complaint advances claims under 42 U.S.C. § 1983 for false arrest and false imprisonment in violation of his Fourth and Fourteenth Amendment rights, as well as state

common law claims for false imprisonment, malicious prosecution, negligence, and defamation. Burritt's claims stem from his arrest for an alleged sexual assault of an eleven-year-old girl, which allegation turned out to be false. For the following reasons, we affirm.

## I. BACKGROUND

Because the facts giving rise to Burritt's arrest are central to the issues in this case, we present them in detail. In early November 2011, Handi-Lift Transportation, Inc. ("Handi-Lift"), a provider of transportation for medical purposes, hired Burritt as a driver. (Burritt had previously worked as an EMT). On November 23, 2011, Burritt was assigned to transport an eleven-year-old girl ("SMH") from Impact Counseling Services ("ICS"), located in Hayward, Wisconsin, to her home in Birchwood, Wisconsin. Burritt was not the regular driver of this route; he had never driven the route prior to November 23, 2011, and had not previously transported SMH.

Burritt picked SMH up at ICS at 4:15 p.m. At 5:01 and 5:02 p.m., SMH used Burritt's cell phone to call her mother to let her know she would be late. Burritt dropped SMH off near her home at 6:14 p.m. The distance between ICS and SMH's home is roughly 30 miles and should be a 40-minute drive.

### A. Initial Investigation

Five days later on November 28, 2011, SMH told her counselor at ICS that the Handi-Lift driver sexually assaulted her on November 23, 2011; ICS contacted the Hayward Police Department. SMH was unwilling to speak with the male officer who responded, Ryan Ignace ("Ignace"). When Ignace could

not locate a female police officer, he requested that Sara Ross Poquette ("Poquette") with Sawyer County Health & Human Services interview SMH.

When Poquette arrived at ICS, she met with Ignace, SMH, and SMH's mother and stepfather. Ignace told everyone that Poquette's interview of SMH would be recorded, and everyone consented.

Poquette began by questioning SMH about the difference between the truth and a lie. SMH gave appropriate responses indicating she knew the difference between the truth and a lie and that there are consequences of lying.

SMH reported that after Burritt picked her up at ICS, he deviated from the normal route and drove her to a house in the country, describing the property as an old farm with outbuildings or sheds, but without farm animals. SMH was able to draw a picture of the house, showing wooded areas and the driveway, and indicating where Burritt parked the Handi-Lift van. She stated Burritt got out of the van, went to the house and let out his six dogs, one of which was a pitbull.

SMH stated that after he let out his dogs, Burritt came back to the van, opened the sliding van door next to her, and touched her on her neck, chest, and pubic area, over her clothes. Burritt then tried to unzip her pants. She yelled, "Get away from me," kicked him, and closed the sliding van door on his hand. SMH then stated that Burritt punched her twice on the inside of her left knee, which left two small bruises. She stated that Burritt said, "I really wanted to have you."

SMH stated that Burritt closed the sliding van door, put his dogs away, and drove the van from the home. She thought Burritt was speeding because she saw a speed limit sign of "53" but Burritt was going 70. She saw the Dinner Bell Restaurant, located in Trego, Wisconsin. Burritt stopped at a gas station near Rice Lake, Wisconsin, got gas, and bought something in a brown paper bag, which SMH thought was beer. At some point during the trip, SMH used Burritt's cell phone to call her mother. Finally, Burritt dropped her off at a silage pile a short distance from her home because Burritt was afraid to drop her off in her driveway. Burritt told SMH to say they were late because they made a "ding dong disaster," went the wrong way, and took a wrong turn. Poquette, a qualified social worker, had no concerns about SMH's suggestibility or reliability, and felt SMH was credible and gave sufficiently detailed information.

Ignace then interviewed SMH's mother and stepfather. SMH's mother confirmed that SMH had called her on the night of the alleged assault. She reported that SMH told her the van driver told SMH to call and say they had made a wrong turn and were going to be late. She indicated SMH did not sound like her usual self during this phone call, and reported that SMH began having night terrors on the night of the alleged assault. SMH's mother and stepfather stated they were very strict about lying at home. The stepfather stated that he saw tire tracks by the silage pile, where SMH reported Burritt dropped her off, roughly 300 feet from their driveway.

On November 28, 2011, Ignace contacted Bill Lussier ("Lussier"), an owner of Handi-Lift, to request information about Burritt, which Lussier provided. Lussier also sent to

Ignace a copy of the Handi-Lift transport log prepared by Burritt, which showed, per the odometer readings of the van, that Burritt traveled 121 miles to transport SMH, but "21" was written as the total miles traveled.

Lussier informed Burritt of SMH's allegations. Lussier had Burritt write out his own version of events pertaining to the November 23, 2011, transport of SMH. Lussier also directed Burritt to have his hand examined, given SMH's report of having closed the van door on Burritt's hand. Burritt went to a clinic the same day and had his hand examined, which showed no injury. Lussier sent Burritt's written statement and the results of the medical examination to the Hayward Police Department the following day.

On November 29, 2011, Ignace went to ICS and photographed a bruise on SMH's knee. Ignace and Hayward Police Assistant Chief Faulstich ("Faulstich") went to Burritt's home in Turtle Lake, Wisconsin, located in Polk County. Ignace took photographs of the property, noting several vehicles in the driveway bearing "EMT" license plates. Several dogs were present outside, and others could be heard barking inside the house. Between the house and the farm field were three buildings. Ignace did not see any farm animals. Faulstich and Ignace felt SMH's description of the location of the alleged assault matched Burritt's property.

Ignace reviewed Burritt's statement, in which he claimed he took a wrong turn that took him to Rice Lake. Ignace then used Yahoo maps to determine how long it would take to drive from ICS in Hayward to Rice Lake, through Trego via Highway 53, to SMH's home in Birchwood. (SMH had reported seeing a

sign with "53" on it). Yahoo maps indicated a distance of 75 miles for this route. Faulstich and Ignace concluded that the alleged assault took place at Burritt's home in Polk County and referred the case to the Polk County Sheriff's Department.

### B. Investigation by Ditlefsen and Polk County

Ditlefsen is an investigator employed by the Polk County Sheriff's Department since 2002. In 2003, she was assigned to the Investigations Unit, specializing in sensitive crimes (including sexual assaults of children). When she was assigned to Investigations, she received specialized training from the Department of Justice and the FBI on investigation of crimes against children. Since 2004, Ditlefsen has investigated roughly 500 cases involving sensitive crimes.

On December 1, 2011, Ditlefsen received a voicemail message from Faulstich informing her of a possible sexual assault case (SMH's case) in Polk County. The next day, Ditlefsen spoke with Faulstich, who informed her of the details of SMH's case, providing her with the information gained from their investigation. Ditlefsen reviewed various documents and photographs she received from the Hayward Police Department. In particular, she reviewed the Handi-Lift transport log for Burritt's trip, which Burritt had signed. The log reflected that Burritt picked up SMH at ICS at 4:15 p.m., with an odometer reading of 218,267 miles, and dropped her off at home at 6:20 p.m., with an odometer reading of 218,388 miles. Although the difference between the odometer readings revealed a total of 121 miles traveled, Burritt had recorded the total mileage of the trip as 21 miles. Ditlefsen thought the

mathematical calculation error was suspicious and that the total miles traveled supported SMH's claims.

Ditlefsen also spoke with Poquette, whom she knew as an experienced child interviewer, about Poquette's interview of SMH. Poquette informed her of the information gained from the interview and agreed to send Ditlefsen her notes and a CD of the recorded interview.

Also on December 2, 2011, Ditlefsen spoke with SMH's mother. She confirmed that SMH was usually picked up from ICS at 4:00 p.m. and dropped off at home at 5:00 p.m. She confirmed that on November 23, SMH was roughly 1.5 hours late, arriving home around 6:30 or 6:45 p.m. She also confirmed that Burritt was not SMH's regular driver, and that he dropped SMH off by the silage pile, rather than pulling into the drive-way. These details were in line with SMH's claims.

In addition, Ditlefsen reviewed a statement from Debbie Schlapper ("Schlapper"), SMH's counselor at ICS. The version of events given to Schlapper by SMH was consistent with the information provided by SMH to Poquette.

Ditlefsen then used MapQuest to examine the possible routes and mileage between ICS and SMH's home, given the stops at Burritt's property and the gas station in Rice Lake. She mapped ICS to Burritt's home, via Highway 63 to Highway 53 to Highway 8, which resulted in a distance of roughly 75 miles and a drive time of 1 hour and 25 minutes. Ditlefsen also mapped a second route between ICS and Burritt's home, via Highway 63 to Highway 8, which was roughly 61 miles with a drive time of 1 hour and 25 minutes. Ditlefsen then mapped a route from Burritt's home to SMH's home of Highway 8 to

Highway 53, which resulted in roughly 51 miles with a drive time of 1 hour. Ditlefsen concluded that the total distance driven and the correlating drive times were very close to the actual odometer readings from the transport log, using SMH's version of events and the possible routes mapped on MapQuest.

On December 5, 2011, Ditlefsen received and reviewed Poquette's notes and the CD of the recorded interview. She compared SMH's description and diagram of the property to an aerial image of Burritt's property and found them to be similar. Any inconsistencies between SMH's description or diagram and Burritt's property could be explained by SMH's age (11), being unfamiliar with the surroundings, and having been involved in a traumatic experience.

On December 5, 2011, Ditlefsen obtained search warrants for Burritt's van GPS device and cell phone records.

During her investigation, Ditlefsen kept two other county employees abreast of and involved in its development. The first person was Ditlefsen's supervisor, Captain Steve Smith ("Smith"). Smith has been an officer with the Polk County Sheriff's Department since 1986. Smith was responsible for reviewing all reports that were sent from the Sheriff's Department to the District Attorney and acted as the liaison between the two offices. Ditlefsen met with Smith multiple times during her investigation and prior to Burritt's arrest. Smith also independently reviewed the materials received from the Hayward Police Department and obtained by Ditlefsen.

The second person was Polk County District Attorney Daniel Steffen ("Steffen"). Steffen was admitted to the Wisconsin bar in 1998 and practiced family law and criminal defense privately before being elected the Polk County District Attorney in 2006. Ditlefsen met with Steffen throughout her investigation to keep him apprised of developments. Steffen personally handled the majority of felony cases for his office and handled the Burritt case in particular. Steffen independently reviewed the case against Burritt and made the charging decision. Also, Steffen reviewed Ditlefsen's applications for the search warrants for the GPS and cell phone records before they were submitted to the judge. The judge found probable cause to issue the search warrants.

Ditlefsen concluded she had probable cause to arrest Burritt primarily based on the following factors: the detailed and consistent reports given by SMH to different people at different times; SMH's detailed description of Burritt's property and dogs; the route traveled; the excessive mileage as reflected by the transport log; the fact that SMH was dropped off significantly later than normal; the fact that SMH was dropped off at the silage pile rather than in the driveway; SMH's mother's report that SMH did not sound like her usual self during the cell phone call on the night of the alleged assault; and SMH began having night terrors on the night of the alleged assault.

Steffen likewise determined there was probable cause to arrest Burritt. Steffen was concerned with Burritt's ability to come into contact with other children as a driver for Handi-Lift and as an EMT. Steffen made the decision to have Burritt arrested and told Ditlefsen to effect the arrest. Smith was kept

informed of these developments and supported the decision to arrest Burritt.

### C. Arrest of Burritt

On December 6, 2011, Ditlefsen went to Burritt's home to arrest him and execute the search warrant for the GPS unit, but Burritt was not home. Ditlefsen returned to the home the next day, with two other officers. Ditlefsen told Burritt that she was there to get the GPS unit and to arrest him. She did not have an arrest warrant. Burritt invited the officers into his home and assisted in retrieving the GPS unit for Ditlefsen. Ditlefsen took photographs of the property and noted six dogs.

One of the other officers drove Burritt to the Sheriff's Department and placed Burritt in an interview room. Ditlefsen read Burritt his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1996), which Burritt waived. Burritt explained that he simply took a wrong turn and had gotten lost while driving SMH home from ICS. He denied any wrongdoing. He denied that his hand had been injured. Ditlefsen completed the probable cause report and booked Burritt into jail. Burritt posted bail the same day and was released.

Also on December 7, 2011, Ditlefsen served the search warrant for Burritt's cell phone records on Verizon.

### D. Post-Arrest Investigation

After Burritt's arrest, Ditlefsen continued her investigation of the case. Handi-Lift provided her with the fuel log and fuel receipt from the Cenex gas station, where Burritt had stopped for gas in Rice Lake on November 23, 2011. The Cenex receipt showed the gas purchase at 5:44 p.m. The fuel log reflected an

odometer reading of 218,361 at the time of the gas purchase. Given the math, Ditlefsen concluded that Burritt had driven 94 miles between ICS, where he picked up SMH, and the Cenex.

On December 9, 2011, SMH's mother contacted Ditlefsen to tell her of additional information SMH was reporting. SMH was now claiming that Burritt had pulled down her pants during the assault, that she had scratches and scabs on her inner thighs, and that she was "spotting." SMH stated she did not report these details earlier because she did not want to show her injuries. Ditlefsen requested another interview with SMH.

Ditlefsen contacted the Cenex station to request video surveillance, but no video was available. She also asked if a receipt was available for the alcohol purchase (SMH reported that Burritt purchased what she thought was beer), but the Cenex did not sell alcohol. The Cenex confirmed the time of the gas purchase on the gas receipt.

On December 12, 2011, SMH's mother again contacted Ditlefsen to inform her that SMH had been examined medically, which showed a laceration and bruising in her genital area. They set the interview of SMH for December 16, 2011.

The next day, December 13, 2011, Ditlefsen took Burritt's GPS unit to Deputy Shawn Demulling ("Demulling") with the St. Croix County Sheriff's Department for forensic examination. No one at the Polk County Sheriff's Department was qualified to perform the forensic analysis.

Also on December 13, 2011, Ditlefsen received Burritt's cell phone records from Verizon. The records showed the two calls

made by SMH to her mother at 5:01 p.m. and 5:02 p.m. The 5:01 p.m. call utilized a cell tower located in Webster, Wisconsin. Ditlefsen mapped the location of the cell tower and found it was located northwest of Siren, Wisconsin, off County Highway D. The 5:02 p.m. call utilized a cell tower in Hertel, Wisconsin. This indicated that Burritt's van was traveling westbound on Highway 70 toward Siren at the time of the calls.

After reviewing the cell phone records, Ditlefsen contacted Handi-Lift to get Burritt's full schedule for the entire day of November 23, 2011. The transport records showed that prior to transporting SMH, Burritt had transported another client to her home in Siren, Wisconsin. That client confirmed Burritt had transported her on November 23, 2011. Burritt's cell phone records aligned with the full transport records and revealed Burritt had been near Siren, rather than his home in Turtle Lake. At this point, Ditlefsen first suspected that SMH's allegations may not be true. Ditlefsen contacted Faulstich and kept him abreast of this development.

On December 16, 2011, Ditlefsen interviewed SMH. SMH gave the same version that she had given earlier, describing Burritt's property and dogs, and providing another drawing of the property. This time, however, SMH reported that after Burritt let out his dogs, he took her out of the van and laid her down in the grass. SMH reported that Burritt removed her pants and underwear, without taking off her shoes, pulled down his pants, and tried to have intercourse with her. SMH reported that it hurt. SMH claimed that in response, she kicked Burritt and ran to the van, trying to pull up her pants as she went. Ditlefsen specifically asked SMH to retell various

portions of her story multiple times, in order to test her, which SMH did.

On December 20, 2011, Ditlefsen received the medical records pertaining to SMH's medical examination. The records confirmed some evidence of bruising and a laceration in SMH's genital area.

On December 22, 2011, Ditlefsen met with Demulling to review his forensic analysis of the GPS unit. The information from the unit showed that Burritt had come within 5 to 10 miles of the Polk County border but never actually entered Polk County during the entire transport of SMH. Further, the GPS data indicated that Burritt never even came close to his property in Turtle Lake, which was 25 to 30 miles further south than his actual route.

The next day, Ditlefsen called Burritt and told him she was going to recommend to the District Attorney that the charges against him be dropped. Ditlefsen also contacted SMH's mother and told her that the GPS data and cell phone records corroborated Burritt's version of events and requested another interview with SMH.

On January 3, 2012, Ditlefsen interviewed SMH. When confronted with the GPS and cell phone data, SMH fully recanted and admitted to lying about the assault. SMH said she made up the story because she did not want to go to ICS for counseling.

Ditlefsen contacted District Attorney Steffen and informed him of SMH's recantation. The next day, January 4, 2012, Steffen filed a motion to dismiss the criminal complaint against

Burritt, which the court approved. In addition, SMH was referred to the Polk County juvenile justice system. Ditlefsen recommended that SMH be charged with false swearing, a felony. SMH ultimately pled to a count of obstruction of justice, a misdemeanor.

### E.  Procedural History

Burritt filed his complaint naming Ditlefsen and Polk County as defendants on December 10, 2012, alleging 42 U.S.C. § 1983 causes of action for false arrest and false imprisonment in violation of his Fourth and Fourteenth Amendment rights, and state common law claims for false imprisonment, malicious prosecution, negligence, and defamation.

Ditlefsen and Polk County moved for summary judgment. The district court granted the motion, finding Ditlefsen had arguable probable cause to effect Burritt's arrest and was entitled to qualified immunity, and that Polk County could not be held liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). The district court declined to assert supplemental jurisdiction over Burritt's state law claims and dismissed them without prejudice.

Burritt then filed a motion to alter or amend the judgment under Federal Rule of Civil Procedure 59(e), which the district court denied.

Burritt appealed these decisions of the district court.

## II. DISCUSSION

### A. Summary Judgment Motion

We review the district court's granting of the motion for summary judgment *de novo* and construe all facts and reasonable inferences in Burritt's favor, as he is the non-movant. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006) (citation omitted). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).

#### 1. Claims Against Ditlefsen

##### a. Warrantless Entry—Consent

Burritt argues on appeal that because there were no exigent circumstances, Ditlefsen's warrantless arrest of him in his home in and of itself violated his Fourth Amendment rights. Two elements are implicated by Burritt's argument. The first is whether Ditlefsen's entry into Burritt's home infringed on Burritt's Fourth Amendment rights. The second is whether Burritt's arrest was supported by probable cause.

With regard to the entry into Burritt's home, Burritt omits one important exception to the warrant requirement: consent. When a person with authority over the premises consents to an entry by law enforcement, that entry is reasonable and does not infringe on the person's Fourth Amendment rights. *See, e.g.*, *United States v. Sabo*, 724 F.3d 891, 894 (7th Cir. 2013) (warrantless entry upheld, consent found where arrestee opened door, stepped back and to side, allowing police into his trailer); *Harney v. City of Chicago*, 702 F.3d 916, 925–26 (7th Cir.

2012) (warrantless entry upheld, consent found where officer followed one of two arrestees into condominium unit and neither arrestee objected to officer's presence in their home); *United States v. Walls*, 225 F.3d 858, 862–63 (7th Cir. 2000) (warrantless entry upheld, consent found where arrestee opened door to officers, stepped back to allow officers' entrance into home, motioned for officers to follow her into kitchen); *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996) (warrantless entry upheld, consent found where arrestee gestured to officers to open door with key and did not object to their presence in his hotel room).

When Ditlefsen told Burritt she was there to get the GPS unit and arrest him, Burritt invited the officers into his home and assisted by providing them with the GPS unit. There is no evidence that Burritt objected to the officers' presence in his home at the time of the arrest. Ditlefsen's entry into Burritt's home did not infringe on his Fourth Amendment rights because he consented to it.

### b. Arguable Probable Cause and Qualified Immunity

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest, false imprisonment, or malicious prosecution." *Mustafa*, 442 F.3d at 547 (citation omitted). However, we need not address whether Ditlefsen did or did not have actual probable cause to arrest Burritt because Ditlefsen is entitled to qualified immunity as she had arguable probable cause.

"Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct

does not violate *clearly established* statutory or constitutional rights that a reasonable person would know about." *Mustafa*, 442 F.3d at 548 (emphasis in original) (citation omitted). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Once qualified immunity is raised, the plaintiff has the burden of establishing that his or her rights were violated and that the law concerning the proffered right "was clearly established at the time the challenged conduct occurred." *Mustafa*, 442 F.3d at 548. Then, the court must determine "whether a reasonably competent official would know that the conduct was unlawful in the situation he confronted." *Id*.

The fact that criminal charges are eventually dropped or the complaining witness later recants has no consideration in the determination of arguable probable cause at the time of arrest. *See, e.g.*, *Fleming v. Livingston Co., Ill.*, 674 F.3d 874, 875, 880 (7th Cir. 2012); *McDonnell v. Cournia*, 990 F.2d 963, 969–70 (7th Cir. 1993) (overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013)).

Ditlefsen has raised qualified immunity as a defense. Burritt has countered that he was arrested without probable cause. Specifically, Burritt argues that Ditlefsen improperly ignored exculpatory evidence, in that the MapQuest route evidence never supported SMH's story, and Ditlefsen should have waited to arrest Burritt only after she received the GPS data. Because Burritt had the constitutional right to be free from an arrest unsupported by probable cause, and that right was clearly established at the time Ditlefsen arrested him, the only element for our consideration is whether a reasonable officer in Ditlefsen's position with the information available to

Ditlefsen at the time could believe it was lawful to arrest Burritt.

Although closely related, a determination of actual probable cause is separate and distinct from a determination of what is sometimes referred to as "arguable probable cause" for qualified immunity purposes. *Fleming*, 674 F.3d at 880. An officer is entitled to qualified immunity if "a reasonable officer could have mistakenly believed that probable cause existed." *Id*. (internal quotations omitted) (citations omitted). "Thus, as long as [Ditlefsen] reasonably, albeit possibly mistakenly, believed that probable cause existed to arrest [Burritt], then [Ditlefsen] is entitled to qualified immunity." *Id*. (citation omitted).

We have found arguable probable cause and upheld qualified immunity in various cases with similar fact patterns to this case. For instance, in *Fleming*, we found arguable probable cause where the officer located the plaintiff-arrestee within seven minutes of receiving a report of a break-in and fondling of two teenage girls, and where the plaintiff-arrestee was the only individual in the area who substantially matched the physical description given by one of the victims. *Id.* Although there were "minor variations" between the physical description given by one of the victims and the physical appearance of the plaintiff-arrestee, the officer was objectively reasonable in his belief that he had probable cause for the arrest and that the plaintiff-arrestee was the person who committed the offense. *Id*.

Here, when Ditlefsen arrested Burritt she had the following pieces of information: SMH had repeated her detailed story to

different individuals and there was no indication from her recitations that she was lying or suggestible; the information given by SMH's mother and stepfather tended to corroborate SMH's story; SMH was able to describe and draw a picture of the scene of the assault, which generally matched Burritt's property; SMH reported that Burritt had a number of dogs, which he actually did have; and the trip took roughly two hours when it should have taken forty minutes. Ditlefsen believed the routes she mapped on MapQuest supported SMH's story.

Burritt argues that the information gained by Ditlefsen from MapQuest never supported SMH's story. In this same vein, Burritt presented evidence that the owners of Handi-Lift, Bill and Connie Lussier, both independently expressed their doubts to Ditlefsen, prior to Burritt's arrest, that the trip with the stops as alleged by SMH could even be accomplished in the established time frame. Ditlefsen denied the Lussiers ever expressed such concerns to her. Although she could have been mistaken, Ditlefsen believed the routes she mapped on MapQuest supported SMH's version of events.

Burritt also argues that Ditlefsen should have waited to arrest him until after she received the GPS data. We rejected a similar argument in *Mustafa*, explaining that "police officers have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness." *Mustafa*, 442 F.3d at 548 (citation omitted). *See also Abbott v. Sangamon Co., Ill.*, 705 F.3d 706, 716 (7th Cir. 2013) (citations omitted). Law enforcement is not required to discover more information to undermine probable cause once it has been established.

*Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004) (citations omitted).

Further bolstering Ditlefsen's qualified immunity is the fact that she consulted with the Polk County District Attorney and her supervisor before arresting Burritt. In *Fleming*, we explained that the fact that the officer had consulted with the District Attorney prior to arresting the plaintiff-arrestee "goes a long way toward solidifying his qualified immunity defense." *Fleming*, 674 F.3d at 881, (citing *Kijonka v. Seitzinger*, 363 F.3d 645, 648 (7th Cir. 2004)); *see also Davis v. Zirkelbach*, 149 F.3d 614, 620–21 (7th Cir. 1998). Prior to Burritt's arrest, Ditlefsen met with the Polk County District Attorney, Steffen, multiple times to keep him advised of developments in the investigation. When Ditlefsen believed she had probable cause to arrest Burritt, legal counsel (Steffen) and her supervisor (Smith) vetted her determination. When it came time to arrest Burritt, Steffen made the decision to arrest and told Ditlefsen to take Burritt into custody. Steffen independently determined that probable cause existed. Also, Ditlefsen's supervisor, Smith, believed probable cause supported the arrest.

We find Ditlefsen was reasonable in her belief that she had probable cause to arrest Burritt. Further, Ditlefsen was objectively reasonable in her reliance on Steffen's probable cause determination and instructions to effect the arrest. Because Ditlefsen is entitled to qualified immunity, the district court did not err in granting her motion for summary judgment on Burritt's § 1983 claims.

### 2.  Claims Against Polk County

A *respondeat superior* theory of liability may not be pursued against a municipal government entity, such as Polk County. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). However, a municipality may be found liable for a § 1983 claim where "execution of a government's policy or custom … inflicts the injury." *Id.*, at 694. In order to prove liability on the part of Polk County under *Monell*, Burritt must prove "either (1) an express policy that, when enforced, causes a constitutional deprivation; or (2) that the constitutional injury was caused by a person with final policymaking authority." *Montano v. City of Chicago*, 535 F.3d 558, 570 (7th Cir. 2008) (citation omitted).

On appeal, Burritt does not present any argument or evidence to advance a claim of a constitutional deprivation caused by an express policy. Burritt loosely argues that District Attorney Steffen, by directing the warrantless arrest, caused his constitutional deprivation. However, Burritt has presented no evidence that the District Attorney was "a person with final policymaking authority." In fact, the parties agree that the County Sheriff was the individual "with final policymaking authority," particularly with regard to procedures for effecting arrests. In this case, the District Attorney instructed Ditlefsen to effect the arrest. There is no evidence the County Sheriff was personally involved in the determination to arrest Burritt.

Also, Burritt briefly argues that because the District Attorney and the County Sheriff were not aware of the Wisconsin Office of Judicial Assistance's *Prosecutor's Sexual Assault Reference Book*, they did not follow the guidelines contained within the book. Burritt argues that this gives rise to

a viable *Monell* claim. Burritt cites no legal authority to support his proposition that a law enforcement agency is required to follow guidelines promulgated by an unrelated, independent agency.

In addition, "in limited circumstances a municipality may be held liable under § 1983 for constitutional violations resulting from a failure to properly train police officers." *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504, (7th Cir. 2010) (citing *City of Canton v. Harris*, 489 U.S. 378, 387 (1989)). Failure to train officers may support a *Monell* claim, but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388. Burritt simply concludes a failure to train on the part of the Polk County Sheriff's Office. He fails to cite to any legal authority or present any evidence that the Polk County Sheriff's Office failed to properly train its officers. In fact, Ditlefsen received specialized training from the Department of Justice and the FBI on investigation of crimes against children.

Because there is no dispute as to any material fact with regard to Burritt's *Monell* claims, the district court did not err in granting summary judgment in favor of Polk County.

### 3. State Law Claims

After granting Ditlefsen's and Polk County's motion for summary judgment, the district court declined to exercise its supplemental jurisdiction and dismissed Burritt's state law claims without prejudice. We review a district court's abstention from exercising its supplemental jurisdiction for an abuse

of discretion only. *Capeheart v. Terrell*, 695 F.3d 681, 686 (7th Cir. 2012).

"The general rule, when the federal claims fall out before trial, is that the [district court] should relinquish jurisdiction over any supplemental (what used to be called 'pendent') state law claims in order to minimize federal judicial intrusion into matters of purely state law." *Carr v. CIGNA Secs., Inc.*, 95 F.3d 544, 546 (7th Cir. 1996) (citations omitted). We have recognized that only in "unusual cases" may a district court exercise its discretion to assert its supplemental jurisdiction based upon the balance of the factors of "judicial economy, convenience, fairness and comity." *Wright v. Associated Ins. Companies, Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994).

We cannot deem this case to be an "unusual" one. Burritt has not provided any argument or citation to any legal authority to support his position that the district court abused its discretion in declining to exercise its supplemental jurisdiction. The district court concluded it had not decided any issue that was dispositive with regard to any of Burritt's state law claims. The district court did not abuse its discretion in dismissing without prejudice Burritt's state law claims.

### B. Rule 59(e) Motion

After the district court granted Ditlefsen's and Polk County's motion for summary judgment, Burritt moved to alter or amend the judgment pursuant to FED. R. CIV. P. 59(e). The district court denied his motion, and we affirm this denial.

We review the district court's denial of the motion to alter or amend the judgment for an abuse of discretion only. *Matter*

*of Prince*, 85 F.3d 314, 324 (7th Cir. 1996) (citation omitted). A motion to alter or amend a judgment is only proper when "the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact." *Id*. (citations omitted). A "manifest error" occurs when the district court commits a "wholesale disregard, misapplication, or failure to recognize controlling precedent." *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601, 606 (7th Cir. 2000) (internal quotations omitted) (citation omitted).

In his motion to alter or amend, Burritt did not present any newly discovered evidence. Neither did he establish a manifest error of law or fact. Based upon our review of the district court's deliberate and detailed rulings, we find that the district court did not commit any manifest error of law or fact in granting Ditlefsen's and Polk County's motion for summary judgment. Specifically, the district court did not disregard or misapply controlling precedent. Thus, the district court did not abuse its discretion in denying Burritt's Rule 59(e) motion.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

POSNER, *Circuit Judge*, dissenting. The arrest of the plaintiff was not based on probable cause, and the dismissal of his suit should therefore be reversed.

I disagree with the majority that Investigator Ditlefsen, the principal defendant, had "arguable probable cause" to arrest Burritt. She had nothing of the sort. A reasonable officer in her position would not have ignored the obvious red flags that arose during her investigation, and so would not have believed that she had probable cause. E.g., *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1016 (7th Cir. 2006). Prior to the arrest Ditlefsen had researched the route that SMH, Burritt's accuser, had said that Burritt had taken (from Impact Counseling Center to Burritt's house, and then from his house to SMH's house), and she had concluded with some help from MapQuest that it would have taken him roughly two hours and twenty-five minutes to drive the alleged route, not including the stops for gas and at Burritt's house reported by SMH. According to his vehicle log Burritt had left Impact Counseling Center with SMH at 4:15 and SMH's mother estimated that her daughter had arrived home between 6:30 and 6:45, and that timeline contradicted SMH's version of events. For how could Burritt have driven a distance that takes two and a half hours to cover nonstop, yet while en route stop to get gas and assault SMH and arrive at her home all in two and a quarter hours or at most two and a half hours? As it turned out, he couldn't have, and we now know that he didn't.

Burritt's former bosses, Bill and Connie Lussier, say that prior to Burritt's arrest they told Ditlefsen that Burritt could not have driven the route, with stops along the way, in such a short time. Connie Lussier told Ditlefsen that she "had a

time, date, location-stamped receipt for Skip [Burritt]'s refu-
eling that showed he was telling the truth," but Ditlefsen
brushed her off, even though the receipt showed that Burritt
couldn't have made the stops alleged by SMH yet arrived at
her house within two and a half hours. Indeed when the re-
ceipt was reviewed by prosecutors, along with data from
Burritt's GPS, the criminal charges against him were dis-
missed, precipitating the present suit, a civil rights suit
against Ditlefsen and her employer.

Ditlefsen told Bill Lussier that she had driven the alleged
route and had confirmed that Burritt could have driven it in
two and a half hours stops and all, though at her deposition
she admitted that she hadn't driven the entire route; so her
time estimate was worthless. Ditlefsen also told the Lussiers,
prior to Burritt's arrest, that his "GPS indicated that [Burritt]
was not where he claimed to be." That was a lie; Ditlefsen
did not obtain the GPS until December 7, 2011, when she ex-
ecuted the search warrant and arrested Burritt—and the
GPS, like the receipt for gas, proved Burritt's innocence.

SMH had said that during the assault (which we know
never took place), which she claimed occurred in Burritt's
car when it was parked in his driveway just before he went
into the house to let his dogs out, she had slammed the car
door on Burritt's hand. A nurse who examined the hand five
days after the alleged assault found no signs of injury.

Ditlefsen had all this evidence of Burritt's innocence *be-
fore* she arrested him, but she presented none of it to the
judge who issued the search warrant, who if informed of
these inconsistencies would not have authorized the search.
In sum, Ditlefsen lacked even arguable probable cause to ar-

rest Burritt. The judgment exonerating her should therefore be reversed.

I have a separate concern about the handling of this case—a concern with automatically, uncritically, allowing the arrest of a person in his home when no arrest warrant has been issued. It's true that the Fourth Amendment does not require search or arrest warrants at all (in retrospect a rather embarrassing omission); the only mention of warrants is found in the clause outlawing general warrants. That clause states that warrants must be based on probable cause, supported by an oath or affirmation, and describing with particularity the target of the warrant. But the only requirement of a lawful search or seizure set forth in the amendment is that it be reasonable; there is no suggestion that a warrant is *ever* required for a search or an arrest.

Even after the Supreme Court interpreted the Fourth Amendment to require warrants in some circumstances, "warrantless felony arrests outside of the home routinely … survived constitutional attack as long as probable cause [to arrest] exist[ed]." *United States v. Winchenbach*, 197 F.3d 548, 554 (1st Cir. 1999). This understanding stemmed from the "the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest." *United States v. Watson*, 423 U.S. 411, 418 (1976). The Court in *Watson* reasoned that "the public safety, and the due apprehension of criminals, charged with heinous offences, imperiously require that such arrests should be made without warrant by officers of the law." *Id.* at 419. Concurring, Justice Powell explained that "logic [ ]

would seem to dictate that arrests be subject to the warrant requirement at least to the same extent as searches. But logic sometimes must defer to history and experience … . There is no historical evidence that the Framers or proponents of the Fourth Amendment, outspokenly opposed to the infamous general warrants and writs of assistance, were at all concerned about warrantless arrests by local constables and other peace officers. … In sum, the historical and policy reasons … fully justify the Court's sustaining of a warrantless arrest upon probable cause, despite the resulting divergence between the constitutional rule governing searches and that now held applicable to seizures of the person." *Id.* at 429, 432.

Yet just a few years later, though two centuries after the ratification of the Fourth Amendment, the Supreme Court declared "that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer [not just a police officer] that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 602–03 (1980). The implication is that normally an arrest warrant is a prerequisite to arresting a person in his home. The Court did not hold that a search warrant would also allow such an arrest. The Court did say that the Fourth

Amendment "prohibits the police from making a warrant-less and nonconsensual entry into a suspect's home in order to make a routine felony arrest," *id.* at 576, but the bare reference to "warrantless" left open the question whether either an arrest warrant or a search warrant would suffice.

In some cases no warrant of any sort is required to authorize an arrest of a person in his home. If police passing by a house hear screams, rush in, and observe a man trying to strangle a woman, they can and should arrest him even though they have no warrant; such an arrest is lawful. And likewise if having approached a home to question a witness officers become aware that a violent, dangerous criminal is inside, as in *Cook v. O'Neill*, 803 F.3d 296, 299 (7th Cir. 2015). The officers in *Cook* were justified in taking reasonable precautions, including arrest, to minimize danger to themselves and the public. Had they out of an abundance of caution instead removed themselves from potential danger, a dangerous criminal would have escaped.

These are examples of arrests justified by "exigent circumstances" (an emergency), which for obvious reasons allow an arrest to be made without a warrant. *Payton v. New York*, *supra*, 445 U.S. at 587. But there are judicial opinions which say that a search warrant plus probable cause for an arrest is enough to justify an arrest in the home without an arrest warrant even if no emergency requires the officers executing the search warrant to seize (that is, arrest) the occupant of the office or home searched. See, e.g., *Jones v. City & County of Denver*, 854 F.2d 1206, 1209 (10th Cir. 1988). Often in such cases, however—in *United States v. Price*, 888 F.2d 1206 (7th Cir. 1989), for example—there is more. The warrant in that case authorized a search for guns, and they were

found. *Id.* at 1208. The police could not let the defendant wander around the apartment while it was being searched; nor would it have been prudent to collect the guns, leave, and leave him there—to find a gun they had missed, or to flee. He was a dangerous person. Burritt—falsely accused and suing for redress—is not and was not thought to be dangerous even at the time of his arrest.

It bears emphasizing that a search warrant alone is not enough to justify an arrest; there must be probable cause to arrest. See, e.g., *United States v. Reinholz*, 245 F.3d 765, 778–79 (8th Cir. 2001). The search itself may reveal probable cause to arrest the occupant of the residence that is being searched. See, e.g., *Mahlberg v. Mentzer*, 968 F.2d 772, 775 (8th Cir. 1992). Police naturally are reluctant to sit around twiddling their thumbs awaiting the receipt of an arrest warrant, which may take hours, knowing they have probable cause to arrest the person they're sitting with. Waiting for an arrest warrant in such a case would be a waste of police resources. Maybe in all such cases, requiring an arrest warrant for the arrest of a person in his home should be waived and the case regarded as one of exigent circumstances.

There were no exigent circumstances in this case. The police had a warrant to search Burritt's home, although if the issuing judge had been presented with all the relevant information he would have found probable cause lacking and thus not have issued the warrant. But the police did not have a warrant to arrest Burritt. I am mindful of the cases that hold that a warrant to search a residence is a license to arrest anyone found there for whom there is probable cause to arrest. See, e.g., *Russell v. Harms*, 397 F.3d 458, 466 (7th Cir. 2005); see also 3 Wayne R. LaFave, *Search & Seizure: A Trea-*

*tise on the Fourth Amendment* § 6.1(c) (5th ed. 2015). But most are cases in which the affidavit on the basis of which the search warrant was issued contains all the information that would be required for the issuance of an arrest warrant. See, e.g., *Russell v. Harms, supra*, 397 F.3d at 466; *United States v. Winchenbach, supra*, 197 F.3d at 553–55; *Jones v. City & County of Denver, supra*, 854 F.2d at 1209. But sometimes there is probable cause to think that a person's home or office contains contraband or some other proper object of a search, but not to think that the person committed a crime. Maybe he'd been asked by a friend to store a bag of salt and had agreed to do so, having no inkling that the bag was actually full of contraband. He tells the police all this and they have, let's say, no reason to doubt him—thus no probable cause to arrest him. Such a case was *United States v. Reinholz, supra*, 245 F.3d at 778–79. And it is not alone. See, e.g., *United States v. Connolly*, 479 F.2d 930, 936 (9th Cir.1973) (overruled on other grounds in *United States v. Bagley*, 772 F.2d 482, 490 (9th Cir. 1985)).

And what if it's obvious to the police when they enter to search a house that the owner is having a party, and so there are several persons besides himself in the house or apartment? Does the search warrant authorize the police to arrest all of them? Surely not, which is just to say that probable cause to search a place is not automatically probable cause to arrest everyone found there.

And even if the affidavit on the basis of which a search warrant was issued establishes probable cause to arrest an occupant of the home to be searched, wouldn't it be better to require that the magistrate have been asked to issue a warrant authorizing both a search and an arrest? Isn't that the

implication of cases like *Payton* that in defiance of the actual wording of the Fourth Amendment insist that ordinarily a warrant is required not only to search a home but also to arrest a homeowner? But however these questions are answered, the important thing in the present case is that probable cause whether to search or to arrest was lacking and thus the officers were not permitted to arrest Burritt, let alone enter his home to arrest him.

The police report states that "after a short conversation[,] and investigator Ditlefsen advising BURRITT that we had a search warrant, he did invite us into his residence." The implication is that he *wanted* them to enter his house. That is absurd. Since they had a search warrant, Burritt could not object to their entry; they needed no invitation and thus when they say he "did invite" they mean he "did accept the inevitable." The majority opinion, which to its credit does not automatically accept the proposition that a search warrant always justifies the arrest of the occupant of the place searched, plucks the "invitation" chord—"Burritt invited the officers into his home"—without remarking the unreality of the "invitation." The opinion goes on to state that "when a person with authority over the premises consents to an entry by law enforcement, that entry is reasonable and does not infringe on the person's Fourth Amendment rights." But that is true only when the occupant can refuse consent. Consent must be voluntary to be legally effective, see *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990), and in this case Burritt couldn't refuse entry, because the search warrant gave the officers the right to enter his house without his consent.

The issuance of a warrant signifies that a judicial officer—a judge or magistrate—has made a determination of

probable cause on the basis of an affidavit of a police officer or a prosecutor. So there is a record, which may enable the person arrested (or whose home is searched) pursuant to the warrant to challenge its validity. When there is no warrant, no documentation, just the say-so of the police, it is very difficult for the person arrested or whose home is searched to prove that probable cause was lacking. After the arrest, or after the search, the police will have no difficulty fabricating probable cause to have made the arrest or conducted the search. They will say they learned this or that which persuaded them that the occupant was a dangerous criminal or had contraband—maybe they'll say they smelled marijuana as they drove past the house in their squad car. Had they said that in an affidavit, the judicial officer might have thought it fishy. Cf. *Johnson v. United States*, 333 U.S. 10, 14–15 (1948). That is a reason for requiring warrants. If there is no warrant, the occupant is relegated to a civil rights suit to establish his innocence, and such a suit may be both costly to litigate and, given the propensity of juries to believe police testimony, futile. The ex post remedy for a search or seizure that lacks probable cause is thus likely to be less effective than the ex ante precaution of submission of an application for a warrant to a judicial officer.

Probable cause was lacking in this case, but even if it were present I can't think of any good reason for the failure of Investigator Ditlefsen, if she thought there was probable cause to arrest Burritt, to have sought an arrest warrant along with a search warrant, or, better, because simpler, a single warrant authorizing both search and arrest.

I would reverse the judgment of the district court.